DONALD J. CAMERON, D.P.M., N. F. COSTIN, D.P.M., AND PODIATRY
ASSOCIATES OF WILMINGTON, P.A. v. NEW HANOVER MEMORIAL
HOSPITAL, INC., PETER J. WATKINS, WALTER CRAVEN, BRUCE B.
CAMERON, MRS. CARONELL C. CHESTNUT, SAMUEL WARSHAUER,
M.D., SIGMOND A. BEAR, M.D., WILLIAM KINGOFF, ALMA RYDER,
THOMAS JERVAY, ELLEN C. WILLIAMS, F. P. FENSELL, IRVING
FOGLER, SEYMORE L. ALPER, R. E. KIZER, JR., FRANK REYNOLDS,
M.D., INDIVIDUALLY AND AS TRUSTEES OF NEW HANOVER MEMORIAL
HOSPITAL, INC., W. F. MORRISON, JR., J. R. DINEEN, M.D. AND DAVID
P. THOMAS, M.D.

No. 815SC1135

(Filed 3 August 1982)

1. **Evidence §§ 29.2, 29.3— minutes of medical staff meeting—admissible under "business records" exception**

   Minutes of medical staff meetings which are made in the regular course of a hospital's business are admissible under the "business records" exception.

2. **Evidence §§ 29.2, 29.3— medical staff meetings—"business records"—laying proper foundation for introduction**

   In an action by two podiatrists against a hospital, among others, the trial court properly excluded minutes of medical staff meetings where the custodians of the records did not adequately authenticate the documents they identified, they did not show the mode of preparation, that the minutes were recorded at or near the time of the meetings, that the minutes were made by someone having knowledge of the data set forth, and they did not show that the minutes were made *ante litem motam*. However, minutes of a 1963 medical staff meeting and a 1964 medical staff meeting were properly authenticated and should have been admissible under the "business records" exception to the hearsay rule, and the trial judge erred in totally excluding a portion of the minutes for the 1964 meeting.

3. **Evidence § 29.3— minutes of hospital staff meetings—qualified privilege applying**

   The trial judge correctly denied plaintiffs' request to review the minutes of hospital meetings which recorded good faith communications of the hospital committees in which those present had a corresponding interest in the administration of the hospital since the common law qualified privilege applied to the minutes. The policy enunciated by G.S. 131-170, which was enacted subsequent to the filing of this action and which deals with the privilege attached to proceedings, records and materials of a provider of professional health services, is grounded in our common law.

4. **Conspiracy § 2.1— civil conspiracy—sufficiency of evidence**

   In an action by two podiatrists stemming from the denial of hospital privileges, there was insufficient evidence beyond mere suspicion or conjecture, either direct or circumstantial, for the jury to infer that two orthopedists agreed to boycott the hospitals from which the podiatrists' privileges were

Cameron v. New Hanover Memorial Hospital

denied, joined by the hospitals and their related defendants, causing plaintiffs' privileges therein to be terminated and thereby creating a civil action for conspiracy.

**5. Contracts § 34— wrongful interference with business relations—sufficiency of evidence**

In an action by two podiatrists against two orthopedists, among others, plaintiffs failed to prove that the orthopedists' actions relating to the podiatrists losing their hospital privileges constituted a wrongful interference with their business relations, contractual rights, and prospective advantage. Although plaintiffs presented evidence to indicate a competition between their practice and that of the orthopedists, the evidence was insufficient to infer any cause and effect relationship between that competition and the denial of staff privileges at the hospital or with any prospective advantage with the hospital.

**6. Unfair Competition § 1— granting hospital staff privileges—rendering of "professional services"—exclusion from G.S. 75-1.1**

In an action which stemmed from the denial of hospital privileges for two podiatrists, the trial court properly directed a verdict against plaintiffs' claims that defendants engaged in a restraint of trade and in unfair methods of competition and practice in violation of G.S. 75-1 and 75-1.1 since (1) plaintiff failed to present sufficient evidence to show the concerted action required for a claim under G.S. 75-1, and (2) defendants were not "sellers" whose acts were forbidden by former G.S. 75-1.1. Even if the current version of G.S. 75-1.1 were applied retroactively to this case, the consideration of whom to grant hospital staff privileges is a necessary assurance of good health care and constitutes the rendering of "professional services" which is now excluded from the aegis of G.S. 75-1.1.

**7. Privacy § 1— invasion of privacy—insufficient evidence of damages**

In an action stemming from the denial of hospital privileges to two podiatrists, the trial court correctly granted defendants' motions for a directed verdict upon the issue of invasion of privacy where plaintiffs failed to produce any evidence that statements and letters attributed to one of the defendants proximately resulted in damages to "their persons, property and profession."

**8. Hospitals § 6— granting hospital staff privileges—standards established by hospital—reasonably related to operation of hospital**

Standards established by a hospital were not arbitrary or capricious where they required podiatrists to complete a year of residency, be board eligible pursuant to certification from the American Board of Podiatric Surgery, and be Fellows in the American College of Foot Surgeons since the standards were reasonably related to the operation of the hospital and since plaintiffs' competency had been adequately reviewed. G.S. 131-126.11A and G.S. 131-126.11B.

**9. Hospitals § 6— hospital not required to grant surgical privileges to podiatrists by statute**

G.S. 90-202.12 which states that patients have the freedom to choose a qualified "provider of care or service which are within the scope of practice of

a duly licensed podiatrist or duly licensed physician" does not require a hospital to grant staff privileges regardless of the standards set by its Board of Trustees which are reasonably related to the operation of the hospital.

APPEAL by plaintiffs from *Rouse, Judge.* Judgment entered 26 February 1981 in Superior Court, NEW HANOVER County. Heard in the Court of Appeals 8 June 1982.

This is an action by two podiatrists, duly licensed to practice podiatry in this State, against a public hospital [hereinafter referred to as New Hanover][1], its individual trustees, its administrator, and two medical doctors on its staff [hereinafter referred to as Dineen and Thomas] alleging a wrongful denial of hospital staff privileges to the podiatrists caused by alleged conspiratorial conduct of Dineen and Thomas which was joined by the other named defendants.

In their complaint, filed 13 October 1978, the podiatrists, plaintiffs Cameron and Costin, alleged twelve claims for relief: (1) that defendants discriminated against plaintiffs solely because they are podiatrists and conspired, among other things, to interfere and did interfere with their civil rights in violation of 42 U.S.C.A. § 1985(3); (2) that defendants had the power to prevent "the wrongs conspired to be done" in the first claim, but failed to exercise that power, and that the wrongs were committed in violation of 42 U.S.C.A. § 1986; (3) that defendants' actions "in refusing to amend the medical-dental staff by-laws so as to permit plaintiffs' application for hospital privileges to be considered on its own merits constitutes a denial of procedural and substantive due process of law," and is in violation of 42 U.S.C.A. § 1983; (4) that defendants conspired to restrain trade by conspiring and agreeing to deny and by denying hospital privileges to plaintiffs, and by agreeing to participate in and participating in a "group boycott" of plaintiffs, anticompetitive in purpose and effect, in violation of G.S. 75-1; (5) that defendants engaged in and continue to engage in "unfair methods of competition and unfair practices," anticompetitive in purpose and effect, in violation of G.S. 75-1.1;

---

1. This action originally also named as defendants Cape Fear Memorial Hospital, Inc., its individual trustees and administrator. However, on 17 February 1981, the parties stipulated that "a controversy between the plaintiffs and the Cape Fear Defendants no longer exists," and entered a voluntary dismissal of the claims against those defendants with prejudice.

(6) that the allegations in claims four and five also constitute violations of the provisions of the common law; (7) that "[d]efendants intentional acts of exclusion of plaintiffs from hospital privileges is a violation of defendants' common-law duty to deal fairly and equitably with plaintiffs"; (8) that defendants intentionally conspired to interfere and destroy and did interfere with plaintiffs' business; (9) that defendants intentionally conspired to interfere and did interfere with plaintiffs' contractual rights with defendant hospitals, with plaintiffs' relationship with their patients, and with plaintiffs' prospective advantage; (10) that "[d]efendant Dineen and others have defamed, slandered and libeled plaintiffs" which has been encouraged by other named defendants; (11) that defendants violated plaintiffs' rights of privacy by making false statements which cast them "in a ridiculous light," and by intentionally placing them "in the position of second-class citizens"; and (12) that defendants' actions violate G.S. 90-202.12.

Plaintiffs prayed for preliminary and permanent injunctions to prohibit defendants from refusing to amend hospital bylaws "to permit consideration of podiatrists for hospital privileges on their individual merits," and to prohibit defendants from the continuance of the wrongful actions alleged in plaintiffs' several claims for relief. Plaintiffs further prayed for actual damages of "at least $250,000.00 per plaintiff," for treble damages under their fourth and fifth claims for relief, and for $1,000,000.00 in punitive damages.

Dineen and Thomas generally denied plaintiffs' allegations and pleaded the statute of limitations as a bar to any claim asserted by plaintiffs. New Hanover and its related defendants similarly answered plaintiffs' complaint.

On 20 February 1980, plaintiffs moved for summary judgment. However, on 16 May 1980, Judge Tillery entered an order in part denying plaintiffs' motion for summary judgment, and dismissing plaintiffs' first, second, and third claims for relief pursuant to motions to dismiss pleaded in defendants' answers. Such motions to dismiss plaintiffs' fourth through twelfth claims were denied. Dineen and Thomas also filed motions for summary judgment on 29 December 1980. On the same date, New Hanover and its related defendants moved for partial summary judgment

and to dismiss plaintiffs' fourth, sixth, eighth, ninth, tenth, and eleventh claims for relief on the ground that those claims are barred by the statute of limitations. The trial judge entered an order on 10 February 1981 in part severing plaintiffs' tenth claim for relief from the trial of the remaining claims, and denying defendants' motions for summary judgment, with the exception of such motions as they relate to the tenth claim for relief; summary judgment upon that claim was allowed as to all defendants except Dineen, whose motion for summary judgment upon the tenth claim was denied.

Subsequent to the filing of their complaint, Judge James heard plaintiffs' motion for a preliminary injunction to prohibit defendants from refusing to amend hospital bylaws to permit consideration of podiatrists for staff privileges. On 29 December 1978, an order was entered which provided, in part, as follows:

Each of the defendant hospitals shall act on Drs. Cameron and Costin's pending requests for amendments to the by-laws to permit the granting of hospital privileges to licensed podiatrists and their pending requests for hospital privileges and shall grant Drs. Cameron and Costin evidentiary hearings before the medical-dental staff of the hospital, or a duly designated committee of said staff, and before the board of trustees in support of those requests.

Each hearing shall be conducted in accordance with the following procedural due process requirements mandated by the Fifth and Fourteenth Amendments to the United States Constitution: right to notice of the hearing; right to representation of counsel at the hearing; right to call witnesses, who shall testify under oath; right to cross-examine witnesses; right to have the hearing conducted on the record before a court reporter agreed upon by the parties; right to a copy of the record; right to a written decision following each hearing, which writing shall contain a statement of the reasons for any determinations made.

Pursuant to this order, a hearing was held on 12 February 1979 by a special committee of the New Hanover medical staff, at which plaintiffs and their counsel were present and offered evidence. Upon receipt of the committee's recommendations, plaintiffs requested a hearing before New Hanover's Board of

Trustees. Following the hearing on 27 March 1979, at which plaintiffs and their counsel were present and offered evidence, the board issued its decision on 8 May 1979 granting to plaintiffs "Type 1 podiatric privileges." Such privileges were defined in recommended amendments to the New Hanover medical staff bylaws as follows:

> . . . Type 1 podiatric privileges allow a podiatrist to treat the foot by mechanical, medical and surgical means in a manner that does not cause bleeding or require an anesthetic, except in the case of the removal of toenails, either partial or complete, with or without excision of the nail matrix, in which case bleeding and the use of a local anesthetic is acceptable.

In reaching this decision, the board established and applied to plaintiffs certain standards for the provision of hospital staff privileges for podiatrists. The decision stated, in part, as follows:

> It is the opinion of the Board that the formulation and adoption of amendments to the medical staff bylaws so as to permit podiatrists to apply for privileges at New Hanover Memorial Hospital should be undertaken without regard for the particular applications now pending from Dr. Cameron and Dr. Costin. The new bylaws should apply to any and all podiatrists who might apply for privileges at New Hanover Memorial Hospital, and should establish standards that are not only fair to the applicant, but which, at the same time, provide the Credentials Committee, the Executive Committee and the Board of Trustees with meaningful and responsible guidelines to maintain the Hospital's highly competent surgical staff.

> With respect to podiatric surgical procedures, it is the position of this Board that the practitioner, whether he be a physician or a podiatrist, shall be highly competent to perform the surgical privileges which are granted to him.

> . . . .

> In short, the Board has a duty to formulate clear standards to be met by any podiatrist seeking privileges at New Hanover Memorial Hospital.

> [T]he traditional and accepted standards that have been applied to physicians seeking surgical privileges at New

Hanover Memorial Hospital include the consideration of whether such physicians are members of their respective medical colleges and whether such physicians have been classified as Board eligible or Board certified by their respective specialty boards. It seems reasonable to apply comparable standards to podiatrists seeking surgical privileges at New Hanover Memorial Hospital.

. . . .

Therefore, it is the opinion of the Board that membership in the American College of Foot Surgeons is still a reasonable and relevant consideration to be considered in evaluating the competence of a podiatrist seeking surgical privileges at New Hanover Memorial Hospital.

. . . .

Since a podiatrist can be classified as Board eligible without having completed a residency, and since residency training is a basic factor to be considered in evaluating the competency of applicants seeking surgical privileges at New Hanover Memorial Hospital, it is the opinion of the Board of Trustees that the residency requirements set forth in the proposed bylaw amendment is a reasonable standard to be satisfied by applicants seeking Type 2 podiatric privileges.[2]

. . . .

[I]t is the opinion of the Board that recognition as being either Board eligible or Board certified by the American Board of Podiatric Surgery is a reasonable and relevant consideration to be considered in evaluating the competence of a podiatrist seeking surgical privileges at New Hanover Memorial Hospital.

The Board perceives its duty in formulating the requested bylaw amendment as being two-fold. The amendment should set forth a framework for evaluating the competency of any applying podiatrist in a fair and reasonable manner.

2. Type 2 podiatric privileges "allow a podiatrist to treat the foot by mechanical, medical and surgical means as permitted by the North Carolina General Statutes, limited only by the scope of the specific privileges granted to said podiatrist."

At the same time, the standards of evaluation set forth in any bylaw must also reflect the responsible exercise of the Board's duty to the public to assure a highly competent medical staff. It is the opinion of the Board that the best efforts of the special committee, the medical staff and this Board have been devoted to accomplishing that two-fold purpose.

Thus, the board concluded, "Sound academic training and continued postgraduate training under the supervision of specialists in the respective medical fields are, in the opinion of this Board, basic factors to be considered in evaluating the competency of any applicant seeking surgical privileges at New Hanover Memorial Hospital."

In his order of 16 May 1980, Judge Tillery reviewed Judge James' order, the records of the hearings held pursuant to that order, and the recommendations made, and found that Judge James' order "has been complied with by the defendant hospitals, the individual plaintiffs have been given due process hearings on their requests for bylaw amendments and hospital privileges, and the actions of the respective hospital boards of trustees on said requests were not arbitrary or capricious."

Upon the completion of plaintiffs' evidence at trial, the trial judge granted defendants' motions for directed verdict upon all issues. Plaintiffs appeal from the judgment entered thereon.

*Smith, Moore, Smith, Schell & Hunter, by Jack W. Floyd, Frank J. Sizemore III, and Alan W. Duncan, for plaintiff-appellants.*

*Ward & Smith, by Thomas E. Harris and Robert H. Shaw III; and Marshall, Williams, Gorham & Brawley, by A. Dumay Gorham, Jr., for defendant-appellee New Hanover Memorial Hospital, Inc. and its related defendant-appellees.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by John H. Anderson, Samuel G. Thompson, and Robin K. Vinson, for defendant-appellees J. R. Dineen, M.D. and David P. Thomas, M.D.*

HILL, Judge.

Plaintiffs' evidence at trial tends to show that plaintiff Cameron graduated from the Ohio College of Podiatric Medicine with the degree of doctor of podiatric medicine. While in school, Cameron performed or assisted in performing surgeries on the human foot. He received his North Carolina license to practice podiatry in 1952. Along with other professional affiliations, Cameron is an affiliate of the American College of Foot Surgeons Associates and an associate of the American College of Foot Surgeons. He is past president of the North Carolina Podiatry Society. Plaintiff Costin graduated from the Temple University School of Chiropody, later known as the Pennsylvania College of Podiatric Medicine, in 1954. He received the degree of doctor of surgical chiropody, later exchanged for the degree of doctor of podiatric medicine. Costin testified that the exchange of degrees "was done only for those whose curriculum was comparable to the curriculum at the time the exchange was made." Costin had no training in surgical procedures under general anesthesia. He began the practice of podiatry in Wilmington in 1956. At the time of trial, Costin served on the North Carolina Board of Podiatry Examiners.

In 1960 or 1961, Cameron applied for and received hospital privileges at Cape Fear Memorial Hospital, Inc. [hereinafter referred to as Cape Fear]. From approximately 1961 to 1964, Cameron performed 75 to 125 surgeries under general anesthesia at Cape Fear. Costin joined Cameron's practice of podiatry in 1962 and also performed surgeries at Cape Fear until 1964.

Cameron testified that he was present at a meeting of the Cape Fear medical staff on 22 April 1964. He described the meeting as follows:

> I did hear Dr. David Thomas make some statements at that meeting. To the best of my recollection, Dr. Thomas stated to the staff that he felt that it would downgrade the profession of orthopedics if podiatrists continued to do surgery on an in-patient. He felt, he and Dr. Dineen, that it would jeopardize them and their status with the American Orthopedic Association, and they could no longer do surgery in Cape Fear Hospital if podiatrists were performing on an in-patient basis as we had been.

A portion of the minutes of the meeting was later admitted into evidence against Dineen and Thomas, but not against New Hanover, and a portion was excluded totally by the trial judge.[3] The admitted minutes stated, in part, as follows:

> Dr. Thomas informed the staff that he and his associate Dr. Dineen were opposed to the practice of podiatry on in-patients in the hospital. He said that this was the opinion of the Orthopedic Academy and that to practice in a hospital . . . where podiatry was permitted might jeopardize his status with the Am. Board of Orthopedic Surg. In particular Dr. Thomas objected to the technical performance of surgery in the operating room suite and to the . . . performance of surgery with the patient under general anesthesia. Dr. Thomas said that he had no objection to podiatrists working on out-patients under local anesthesia and that there was nothing personal concerning Drs. Cameron and Coston [sic] to which his opposition had reference.

> When queried by Dr. Mebane as to why he held these views, Dr. Thomas said that he considered the practice of podiatric surgery in the operating room and when under general anesthesia to represent an infringement on the field of orthopedic surgery and to downgrade, (to lower the status of) orthopedic surgery. Dr. Thomas also said that he did not see how he could continue to work in a hospital which had podiatrists (working in the operating rooms and under general anesthesia).

> Dr. Thomas said he could not speak for the other or-thopedists in town (Drs. Dorman, Boyes and T. Craven) who are associated in practice.

Following the 22 April meeting, Cameron continued to exercise non-surgical staff privileges at Cape Fear; however, all staff

---

3. The trial judge did not allow the following portion of the minutes of the 22 April 1964 meeting into evidence, which immediately follows that which was admitted and quoted above:

It is, however, common information to the staff that the views of Drs. Dorman and Boyes do not greatly differ from that of Drs. Thomas and Dineen. Dr. Craven has only been in town a short while and his views are not definitely known (although it is presumed that he will act in concert with his two associates in this matter).

privileges at Cape Fear subsequently were terminated. In 1973 and 1974, plaintiffs constructed operating room facilities in their office. Surgeries performed in that office facility were under local anesthesia. Cameron testified that "[t]he number of surgical procedures performed by me and Dr. Costin in our own privately constructed operating room has remained fairly constant over the years from 1973 to date—at about 20 to 30 a month."

Since their staff privileges were terminated, plaintiffs from time to time made applications to Cape Fear and New Hanover[4] "for clinical privileges." On 30 July 1973, plaintiffs wrote a letter to the chairman of the Board of Trustees at Cape Fear which was read to the jury as follows:

"On July 6, 1973, we received correspondence from Mr. R. J. McLeod that 'at a meeting of the Board of Trustees, held on July 3, 1973, it was decided that it would not be advantageous for the hospital to have a podiatry staff at the present time.' For four years we had full privileges including the operating room. In April 1964 our privileges were greatly restricted; however, the podiatry staff still remained a part of the hospital bylaws. We feel that the deletion of podiatric staff privileges by the recent revision of hospital bylaws constitutes a violation of our rights according to Standard VII of the 1970 Accreditation Manual for Hospitals by the Joint Commission on Accreditation of Hospitals, page 43:

'Provide an appeal mechanism relative to medical staff recommendations for denial of staff appointments and reappointments, as well as for denial, curtailment, suspension or revocation of clinical privileges. This mechanism shall provide for review of decisions, including the right to be heard at each step of the process when requested by the practitioner. The final decision must be rendered by the governing body within a fixed period of time.'

"In accordance with the above paragraph, we are requesting a review of this decision and would like to be heard at each step of the process as outlined above."

4. New Hanover was incorporated on 26 May 1967.

On 9 September 1975, plaintiffs sent an "informational letter" to the Cape Fear medical staff concluding that "we do hereby formally request that the medical staff of Cape Fear Memorial Hospital approve amending the bylaws to provide for the establishment of a podiatry staff at this institution." Again on 24 January 1978, plaintiffs requested "that the Board of Trustees of Cape Fear Memorial Hospital consider an amendment to the bylaws of the hospital which would allow for the inclusion of podiatry in accordance with the Accreditation Manual for Hospitals . . . ." A similar letter was written to the Chairman of the Board of Trustees at New Hanover on 9 February 1978. Following the acknowledgment of receipt of both letters at Cape Fear and New Hanover, plaintiffs heard nothing further on their requests.

Dr. Heber Johnson, a general surgeon at Cape Fear, testified that he knew Cameron and, by observing Cameron's performance in surgery, determined that his surgery was "excellent." Johnson further testified that during a medical staff meeting at Cape Fear in October 1973, Dineen presented a case he thought was treated unnecessarily and overcharged by plaintiffs. Johnson stated that "Dr. Dineen said that he did not want to lie down with skunks. I presumed that from the tenor of the conversation, his conversation, that the appellation 'skunks' was applied to the podiatrists who had applied for hospital privileges." Although he testified that he knew why plaintiffs' hospital privileges were restricted in 1964, Johnson stated, "I have no personal recollection of the events that occurred in 1964 except from the minutes of the meetings of the staff which I personally extracted to review two years ago for the deposition which I had." However, when shown a copy of the minutes of the Cape Fear medical staff meeting on 27 April 1964, Johnson testified on *voir dire* that it "does not refresh my recollection as to why the privileges were restricted."[5]

---

5. The minutes of the 27 April 1964 Cape Fear medical staff meeting which were examined by Johnson stated, in part, as follows:

> . . . A motion was made by Dr. Sinclair and seconded by Dr. Johnson to the effect that the Podiatrist service be discontinued on in-patients as of July 1, 1964. This action was taken because they had been informed that the Orthopedic surgeons would not continue to operate in our hospital so long as a Podiatrist is present in the hospital on in-patient surgery.

This and certain other exhibits offered by plaintiffs into evidence were later excluded by the trial judge.

Robert J. McLeod was the administrator of Cape Fear from 1959 to 1980. He testified that he did not recall discussing plaintiffs' competency to use the hospital's operating room with Dineen or Thomas. McLeod did recall that at one meeting, "Dr. Dineen said if the podiatrists [plaintiffs] were admitted to the staff that they would not patronize the hospital and they would talk to the other orthopedic surgeons and ask them not to patronize the hospital." However, McLeod further testified, "I do not know if the withdrawal of privileges at Cape Fear Hospital was directly responsive to the demands of the orthopedics [sic] on the staff."

Defendant William F. Morrison, administrator of New Hanover since 1969, testified that the process by which clinical privileges are granted to "health practitioners" is as follows:

I am fairly well acquainted with the process at New Hanover by which clinical privileges are granted to health practitioners. A practitioner that wishes privileges at our institution normally inquires as to what the process is. We inform them that there is an application which we supply them with. The application is filled out by the inquirer or applicant, returned to my office along with recommendation letters. We then see that the application is complete, turn the application over to the designated committee of the Medical Staff to begin processing. If it is determined from the application that the applicant does not have a license to practice in the State of North Carolina, it stops at that point. If he does have a license to practice his profession, it goes to a committee of the medical staff. Our office turns the application over to the chairman of the Credential Committee, an appointed chairman of that committee . . . . The committee is generally responsible for establishing that the applicant has the required credentials for the position on the staff which is being applied for. . . . The process of the credential granting privileges is entirely that of the Medical Staff of New Hanover Hospital and the Board of Trustees. . . . The Credential Committee reports to the Executive Committee of the Medical Staff. The Executive Committee hears the comments and report of the Credential Committee and acts upon a recommendation of the committee concerning the applicant.

Morrison further testified that he did not believe this process would apply to a podiatrist who applied for staff privileges in

1973 and 1977. He stated, "If I had received an application for clinical privileges at New Hanover by a podiatrist in the year 1973, I don't know what I would have done with it. I have no provision for processing."

Morrison identified numerous minutes of New Hanover Executive Committee and medical staff meetings which were read to the jury that described, in part, the process of considering plaintiffs' requests to change the staff's bylaws to include privileges for podiatrists at New Hanover. This evidence was admitted against New Hanover but not against Dineen and Thomas.

At the 11 June 1973 meeting of the Executive Committee, plaintiffs were present and presented their request to amend the bylaws " 'to include granting of hospital privileges to qualified podiatrists.' " The matter was referred to the Department of Surgery for consideration. On 9 July, Thomas, reporting for the Department of Surgery, stated that the department recommended that privileges not be granted to podiatrists. The Executive Committee adopted the department's recommendation " 'on the basis primarily that the extra work and supervision by the medical or surgical staff members would tend to overburden their already heavy patient load.' "

The 13 August 1973 minutes of the Executive Committee reveal that plaintiffs were granted permission to appear before the committee and present further evidence on behalf of their request for staff privileges. However, at the 7 September meeting of the surgical staff, it was unanimously recommended that the Executive Committee be advised that " 'surgical staff saw no medical reason to change the bylaws at this time . . . .' " The Executive Committee voted to seek legal advice on the question at the 10 September 1973 meeting; the medical staff likewise voted to seek legal advice at its 11 September meeting. Upon receipt and consideration of the legal advice, the medical staff " 'overwhelmingly' " voted to deny plaintiffs' request on 11 December 1973. The Board of Trustees was informed of this action at its 18 December 1973 meeting.

The New Hanover Executive Committee again considered plaintiffs' request to amend the medical staff's bylaws to include staff privileges for podiatrists on 13 March 1978. The matter then was referred to the Credentials Committee; this action was

reported to the Board of Trustees at its 25 April 1978 meeting. On 13 November 1978, one month after plaintiffs filed their complaint in the present case, the Executive Committee heard the report of the Credentials Committee. The minutes of that meeting were read to the jury, in part, as follows:

"At the present time our bylaws do not provide for [podiatrists to become members of the medical staff]. The committee recommended that the bylaws be amended so that applications for qualified podiatrists could be considered. They further recommended that surgical or nonsurgical privileges be granted depending upon individual qualifications. Their work on the staff would be subject to the restrictions defined in the JCAH [Joint Commission on the Accreditation of Hospitals] standards similar to the restrictions of dentists."

Ellen Carraway Williams, a member of the New Hanover County Board of Commissioners and a member of New Hanover's Board of Trustees in 1978, then considered in her official capacity the question of whether podiatrists should have clinical privileges at Wilmington hospitals. She testified that although the patient was the "major concern," she relied upon the hospital committees to inform her "as a Trustee what surgeons are or are not competent to practice in the hospital . . . ." Williams further testified as follows:

My feeling is that the hospital must determine who is qualified to serve in that hospital whether it is podiatrists or any other M.D., surgeon or what have you; that the hospital must determine whether they are going to be allowed to practice in that hospital and if they are not allowed to practice in that hospital, then they have to make the choice. As to who has to make the choice, the Board has to determine with what information comes to it, all the information it can determine, whether they feel that those asking privileges have the qualifications that the hospital has set as standard.

Williams thought that she told the local media that she "did not feel these two plaintiffs were qualified to practice in the hospital." However, she stated that she has not agreed with anyone to destroy plaintiffs' professional practice.

The deposition testimony of Dineen was admitted into evidence concerning his objections to Costin as a speaker for the Cape Fear Diabetes Association on the subject of the diabetic foot. He wrote two letters to the members of the New Hanover Department of Orthopedic Surgery decrying the choice of the speaker. Dineen testified, "Inasmuch as there were eleven orthopedists practicing in Wilmington at that time, I felt that a chiropodist, now called podiatrist, was a poor choice of speaker on the subject of the diabetic foot, or the care of the diabetic foot, which is a condition that is not just limited to the foot."

Bruce Canady, a pharmacist employed by the Area Health Education Center, testified that he spoke with Dineen concerning speakers for the diabetes association. Canady rejected Dineen's idea of taping Costin's speech, and Dineen "at that time said that he was of the impression that it was not up to me and I disagreed with that. He then said that he would take the matter further as, I believe he said, 'It was time to put on the gloves.'"

Dineen also was called as an adverse witness for plaintiffs. He testified that in late 1964, he told McLeod, "I was not going to continue to practice at the Cape Fear Hospital if podiatrists were allowed to operate in the operating room unsupervised, as I had learned had happened prior to my arrival." Dineen denied that he ever made such a statement to anyone associated with New Hanover. Dineen variously described plaintiffs as follows:

I was dealing with two chiropodists who did not have hospital training, did not have any post-graduate training, had limited premedical training and very limited training in the four years referred to in their graduate program.

. . . .

The plaintiffs are not now and never have been podiatrists. They are what I call chiropodists. Under my definition of that term, it is a lower status than that of podiatry.

. . . .

I am certain that these plaintiffs qualified under that law [licensing of podiatrists] or they wouldn't be practicing. But in my own mind, the way I define the term podiatry, they do not qualify.

. . . .

> As to whether I have ever made an investigation to determine whether or not these doctors are competent surgeons in their field, I am sure they are competent in chiropody, obviously, but not in podiatry. I don't recall sharing that opinion with my colleagues on the staff at the hospitals from time to time through the years. This is my own personal opinion from my own personal experience with podiatrists.

He further testified that "[a]t no time after 1964 did I join with Dr. Thomas in opposing the practice of podiatry surgery in the hospitals in Wilmington."

Dr. James Alan Gray, a surgeon at Cape Fear and New Hanover, testified by deposition, in part, as follows:

> . . . I felt in 1964 that I would be subject to criticism, as a member of the American Academy of Orthopaedic Surgeons, if I operated in a hospital that permitted podiatrists to operate on patients under general anesthesia without medical supervision. . . . I think it would have, in my opinion, adversely affected my reputation by practicing with podiatrists in the hospital.

> . . . .

> Concerning the nature of my position, my objection was that they were not qualified to do the surgical procedures that they applied for. These procedures were open operations on the foot, meaning procedures that could draw blood. I considered them unqualified to perform those procedures . . . [because of] . . . the knowledge that we had of their background and training.

Nevertheless, Gray stated that he and Dineen had no discussion about their opposition to plaintiffs other than "passing remarks" which indicated that they shared the same opinion.

I

By their Assignment of Error Nos. 7 and 8, plaintiffs argue that substantial evidence was improperly excluded by the trial judge that further demonstrated the sufficiency of the evidence

to withstand defendants' motions for directed verdict. Specifically, plaintiffs contend that the judge improperly excluded certain minutes of medical staff meetings and other hospital documents "under the guise of the hearsay rule" and that the judge erred in denying to plaintiffs access to all the minutes of the New Hanover medical staff meetings and other documents in New Hanover's possession on the ground of an asserted privilege. Because our disposition of these assignments of error necessarily affect our consideration of the propriety of the directed verdict entered for defendants, we address these questions at the outset of this opinion.

A

> "Evidence, oral or written, is called hearsay when its probative force depends, in whole or in part, upon the competency and credibility of some person other than the witness by whom it is sought to produce it." . . . Expressed differently, whenever the assertion of any person, other than that of the witness himself in his present testimony, [footnote omitted] is offered to prove the truth of the matter asserted, the evidence so offered is hearsay. [Footnote omitted.] If offered for any other purpose, it is not hearsay.

1 Stansbury's N.C. Evidence (Brandis rev. 1973) § 138, pp. 458-60 [hereinafter referred to as Stansbury]. *Accord Wilson v. Hartford Accident & Indemnity Co.,* 272 N.C. 183, 158 S.E. 2d 1 (1967). Hearsay evidence is inadmissible unless it falls within one of the recognized exceptions to the hearsay rule.

The modern "business records" exception to the hearsay rule was enunciated by our Supreme Court in the landmark case of *Firemen's Insurance Co. v. Seaboard Air Line Railway,* 138 N.C. 42, 50 S.E. 452 (1905). The requisites of this exception to admit hearsay evidence have been summarized adequately: "If the entries were made in the regular course of business, at or near the time of the transaction involved, and are authenticated by a witness who is familiar with them and the system under which they are made, they are admissible." 1 Stansbury § 155, p. 523.

[1] In the present case, minutes of medical staff meetings and other hospital documents are clearly hearsay for they were offered to prove the truth of the matters asserted therein.

---

---

However, defendants argue that "[m]inutes of medical staff meetings do not constitute business records or hospital records" because only records used in the provision of health care are admissible under the "business records" exception. "It is a matter of common knowledge, we think, that modern hospitals are staffed by medical, surgical and technological experts who serve as members of a team in the diagnosis and treatment of human ills and injuries." *Sims v. Charlotte Liberty Mutual Insurance Co.,* 257 N.C. 32, 35, 125 S.E. 2d 326, 329 (1962). An essential part of the "teamwork" required of modern hospital staffs is the staff meeting where, as the evidence in the present case clearly shows, important decisions are made concerning the provision of health care in the hospital.[6] The need for accuracy in these records is as important as that required of hospital patient records. *Cf. Sims v. Charlotte Liberty Mutual Insurance Co., supra.* Therefore, to accept defendants' contentions that the minutes of medical staff meetings are not "business records" is to deny the reality of modern hospital administration. There is no question, then, that the minutes of medical staff meetings were made in the regular course of the hospital's business.

[2] Of course, a proper foundation must be laid for the introduction of these "business records" in light of the requisites of the hearsay exception stated above.

> The hospital librarian or custodian of the record or other qualified witness must testify to the identity and authenticity of the record and the mode of its preparation, and show that the entries were made at or near to the time of the act, condition or event recorded, that they were made by persons having knowledge of the data set forth, and that they were made *ante litem motam.*

*Sims v. Charlotte Liberty Mutual Insurance Co., supra* at 35, 125 S.E. 2d at 329. Here, plaintiffs apparently sought to lay a foundation for the admission of the minutes of medical staff meetings and other hospital documents by eliciting the testimony of Dr.

---

6. The *Accreditation Manual for Hospitals* (1979 ed.), p. 81, states the following "principle" concerning the medical staff: "There shall be a single organized medical staff that has the overall responsibility for the quality of all medical care provided to patients, and for the ethical conduct and professional practices of its members, as well as for accounting therefor to the governing body."

Albert David Warshauer, McLeod, Morrison, and Joseph L. Soto, who replaced McLeod as Cape Fear's administrator.

On *voir dire*, Warshauer testified that he recorded the minutes of certain Cape Fear medical staff meetings. He stated that he would take "little notes" during the meeting and "go to another office where there was a typewriter and type the minutes" after the meeting or on the next day. Warshauer further testified that the minutes were kept in a book and that he considered them to be a part of the official records of the hospital. McLeod testified that, as Cape Fear's administrator, he was responsible for the hospital's records, which were locked in his office, including the records of the medical staff. He stated that certain minutes of medical staff meetings which he identified were "business records." Morrison also testified that as New Hanover's administrator, he is responsible for the minutes of the Board of Trustees. He stated, "It is part of my duties at New Hanover Memorial Hospital to serve as custodian of the minutes of the Board of Trustees and their various committees, and of the Medical Staff and its various committees." Soto merely testified that he is "custodian of the minutes of the Medical Staff and the Board of Trustees" at Cape Fear.

We conclude that the testimony of McLeod, Morrison and Soto did not lay a proper foundation under the criteria set out in *Sims.* Although they were custodians of the records, McLeod, Morrison, and Soto did not adequately authenticate the documents they identified; they did not show the mode of preparation, that the minutes were recorded at or near the time of the meetings, that the minutes were made by someone having knowledge of the data set forth, and they did not show that the minutes were made *ante litem motam. See Sims v. Charlotte Liberty Mutual Insurance Co., supra.* However, these deficiencies which are fatal to the admission of the documents identified by McLeod, Morrison, and Soto are present in the *voir dire* examination of Warshauer summarized above. Thus, only those minutes authenticated by Warshauer are admissible under the "business records" exception to the hearsay rule since the remaining requisites of that exception have been met through Warshauer's *voir dire* testimony.

Our review of the record on appeal reveals that the minutes of only two Cape Fear medical staff meetings properly authenti-

cated by Warshauer were identified and offered into evidence: the 22 April 1964 minutes and the 24 April 1963 minutes.[7] Both documents were read, in part, to the jury and admitted by the trial judge against Dineen and Thomas but not against New Hanover and its related defendants. It is of no consequence that the proper foundation was laid subsequent to the first introduction of the minutes of the 22 April 1964 meeting which Warshauer recorded. *See State v. Franks,* 262 N.C. 94, 136 S.E. 2d 623 (1964).

Although we sustain plaintiffs' assignments of error as described above, we find no error in the admission of the minutes of these Cape Fear medical staff meetings against Dineen and Thomas, but not against New Hanover and its related defendants. However, we conclude that the trial judge erred in totally excluding a portion of the minutes for the 22 April 1964 meeting. *See* footnote 3, *supra.*

As noted above, the minutes were offered to prove the truth of the matters asserted therein. Warshauer's *voir dire* testimony regarding this portion of the 22 April 1964 minutes indicates that he is not certain of the source of the comments excluded by the trial judge. However, Warshauer testified that the excluded portion of the minutes was "true to the best of my knowledge at the time I wrote it." Under these circumstances, the "business records" exception to the hearsay rule equally applies to the excluded portion.[8] It also should have been admitted against Dineen and Thomas, but not against New Hanover and its related defendants.

---

7. The minutes of the 24 April 1963 meeting of the Cape Fear medical staff describe a program given to the staff by plaintiffs concerning the practice of podiatry in the United States. The program was "enjoyed by all."

8. The rationale of the "business records" exception, as recently stated by this Court, further supports the admission of the excluded portion of the 22 April 1964 minutes. In *State v. Young,* 58 N.C. App. 83, 88, --- S.E. 2d ---, --- (1982), Judge Hedrick wrote as follows:

The admissibility of entries made in the regular course of business derives from circumstances which furnish a guaranty of the trustworthiness of such entries, notwithstanding the fact that the person making the entry is unavailable for cross-examination; the guaranty of trustworthiness derives from the desire of the person making the entry to provide accurate information to the business for which the records are intended.

B

[3] Prior to the presentation of evidence, counsel for New Hanover objected to plaintiffs' request to review certain documents which the trial judge had ordered to be brought to trial. Defendants' objection was grounded as follows: "First, the privilege as to the nature of the discussions that were the subjects of the meetings, which are reflected by the minutes. Second, the fact that some of the minutes reflected meetings of the trustees, committees where counsel was present." The judge sustained the objections based upon the assertion of attorney-client privilege and sealed the documents he had ordered to be brought to trial.

We are constrained to note that subsequent to the filing of this action, G.S. 131-170 was codified as follows:

> The proceedings of, records and materials produced by, and the materials considered by a committee are not subject to discovery or introduction into evidence in any civil action against a provider of professional health services arising out of the matters which are the subject of evaluation and review by the committee, and no person who was in attendance at a meeting of the committee shall be required to testify in any civil action as to any evidence or other matters produced or presented during the proceedings of the committee or as to any findings, recommendations, evaluations, opinions, or other actions of the committee or its members. However, information, documents, or records otherwise available are not immune from discovery or use in a civil action merely because they were presented during proceedings of the committee nor should any person who testifies before the committee or who is a member of the committee be prevented from testifying as to matters within his knowledge, but the witness cannot be asked about his testimony before the committee or opinions formed by him as a result of the committee hearings.

Thus, under present law, plaintiffs would not be entitled to introduce any of the minutes of medical staff meetings they offered into evidence unless a witness to the meetings testified as to

"matters within his knowledge . . . ."[9] *Id.* In effect, the legislature has created a qualified privilege for the communications described above.

While construing a statute similar to G.S. 131-170, the California Court of Appeal noted that Cal. Evid. Code (West) § 1157 "was enacted upon the theory that external access to peer investigations conducted by staff committees stifles candor and inhibits objectivity. . . . Section 1157 represents a legislative choice between competing public concerns. It embraces the goal of medical staff candor at the cost of impairing plaintiffs' access to evidence." *Matchett v. Superior Court for County of Yuba,* 40 Cal. App. 3d 623, 629, 115 Cal. Rptr. 317, 320-21 (1974).

Our Supreme Court has long embraced this philosophy as the basis for the doctrine of privileged communications: " 'The great underlying principle of the doctrine of privileged communications rests in public policy.' *Alexander v. Vann,* 180 N.C. 187, 104 S.E. 360. The basis of privilege is the public interest in the free expression and communication of ideas." *R. H. Bouligny, Inc. v. United Steelworkers of America,* 270 N.C. 160, 170, 154 S.E. 2d 344, 354 (1967). Where this interest is sufficient to outweigh the State's interest in protecting a plaintiff, the law does not allow recovery of damages occasioned by the communication. *Id.* Thus, the defense of qualified privilege arises in circumstances where

> (1) a communication is made in *good faith,* (2) the subject and scope of the communication is one in which the party uttering it has a valid interest to uphold, or in reference to which he has a legal right or duty, and (3) *the communication is made to a person or persons having a corresponding interest, right, or duty.*

*Presnell v. Pell,* 298 N.C. 715, 720, 260 S.E. 2d 611, 614 (1979) (emphasis original). *Accord Stewart v. Nation-Wide Check Corp.,* 279 N.C. 278, 182 S.E. 2d 410 (1971). *See also* Prosser, *Law of Torts* (4th ed. 1971) § 115, p. 785 [hereinafter referred to as Prosser].

---

9. Our holding that the minutes of the medical staff meetings on 22 April 1964 and 24 April 1963 should have been admitted against Dineen and Thomas, but not against New Hanover and its related defendants, under the "business records" exception to the hearsay rule does no damage to the policy of the State as stated in G.S. 131-170. Warshauer, who properly authenticated those minutes, was a witness to those meetings.

In the present case, the minutes of the meetings sought to be protected by the asserted privilege recorded good faith communications of the hospital committees in which those present had a corresponding interest in the administration of the hospital. The rationale of the common law qualified privilege therefore applies. Thus, although the law in this State was uncertain concerning the subject of privileged communications in the context of hospital committee records at the time of the present case, the policy enunciated by G.S. 131-170 is grounded in our common law. We hold that the trial judge correctly excluded and sealed the documents based upon New Hanover's general assertion of privilege; however, we do not endorse defendants' objection based upon their assertion of attorney-client privilege. *See generally* 1 Stansbury § 62, p. 196.

## II

Plaintiffs' Assignment of Error No. 1 alleges that the trial judge erred in granting defendants' motions for a directed verdict upon all issues at the end of plaintiffs' evidence. The question raised by a directed verdict motion is whether the evidence is sufficient to go to the jury. *Rappaport v. Days Inn of America, Inc.*, 296 N.C. 382, 250 S.E. 2d 245 (1979); *Kelly v. Harvester Co.*, 278 N.C. 153, 179 S.E. 2d 396 (1971). In passing upon such a motion, the trial judge must consider the evidence in the light most favorable to the non-movant, resolving all conflicts and giving to him the benefit of every inference reasonably drawn in his favor. *Rappaport v. Days Inn of America, Inc., supra; Summey v. Cauthen*, 283 N.C. 640, 197 S.E. 2d 549 (1973). A directed verdict motion by defendant may be granted only if the evidence is insufficient as a matter of law to justify a verdict for plaintiff. *Husketh v. Convenient Systems, Inc.*, 295 N.C. 459, 245 S.E. 2d 507 (1978); *Dickinson v. Pake*, 284 N.C. 576, 201 S.E. 2d 897 (1974). We now examine the causes of action stated in plaintiffs' complaint which they believe should have gone to the jury to determine the propriety of the trial judge's ruling.

## A

[4] "A conspiracy has been defined as 'an agreement between two or more individuals to do an unlawful act or to do a lawful act in an unlawful way.'" *Dickens v. Puryear*, 302 N.C. 437, 456, 276 S.E. 2d 325, 337 (1981), *quoting State v. Dalton*, 168 N.C. 204, 205,

83 S.E. 693, 694 (1914). Thus, to create a civil action for conspiracy, " 'a wrongful act resulting in injury to another must be done by one or more of the conspirators pursuant to the common scheme and in furtherance of the common object.' " *Muse v. Morrison*, 234 N.C. 195, 198, 66 S.E. 2d 783, 785 (1951), *quoting Holt v. Holt*, 232 N.C. 497, 500, 61 S.E. 2d 448, 451 (1950).

> The action is for damages caused by acts committed pursuant to a formed conspiracy, rather than by the conspiracy itself; and unless something is actually done by one or more of the conspirators which results in damage, no civil action lies against anyone. The gist of the civil action for conspiracy is the act or acts committed in pursuance thereof—the damage —not the conspiracy or the combination.

*Reid v. Holden*, 242 N.C. 408, 414, 88 S.E. 2d 125, 130 (1955), *quoted in Shope v. Boyer*, 268 N.C. 401, 405, 150 S.E. 2d 771, 774 (1966). "Although civil liability for conspiracy may be established by circumstantial evidence, the evidence of the agreement must be sufficient to create more than a suspicion or conjecture in order to justify submission of the issue to a jury." *Dickens v. Puryear, supra* at 456, 276 S.E. 2d at 337.

In their brief, plaintiffs herein state that the evidence is sufficient to show that (1) "plaintiffs' surgical privileges at Cape Fear were terminated *as a direct result* of the threatened group boycott by the orthopedic surgeons in Wilmington, and in particular, by Dr. Thomas and Dr. Dineen"; and (2) "[b]ecause of the *economic coercion imposed by the orthopedists'* threatened boycott, New Hanover acquiesced in and embraced the conspiracy"—conduct dubbed by plaintiffs as "anticompetitive in nature." Considering the evidence offered at trial by plaintiffs as recounted above, including the portion of the minutes of the 22 April 1964 meeting which should have been admitted by the trial judge, we conclude that such evidence is insufficient to support the statements made by plaintiffs in their brief. In sum, there is no sufficient evidence beyond mere suspicion or conjecture, either direct or circumstantial, for the jury to infer that Dineen and Thomas agreed to boycott the two hospitals, joined by New Hanover and its related defendants, causing plaintiffs' privileges therein to be terminated.

Plaintiffs, of course, point to the statements attributed to Dineen and Thomas in the minutes of Cape Fear medical staff meetings in 1964 and 1973 quoted above. However, we construe that evidence as individual expressions of like personal opinion that do not rise to the level of proof of an agreement to perpetrate the "anticompetitive" conduct alleged by plaintiffs. More importantly, there is no evidence of an overt act, or acts, by defendants that is indicative of an agreement which resulted in damage to plaintiffs. Had plaintiffs established a *prima facie* conspiracy independently of the statements attributed to Dineen and Thomas, those statements would have been admissible as declarations of the conspirators. *See Greer v. Skyway Broadcasting Co.,* 256 N.C. 382, 124 S.E. 2d 98 (1962); 2 Stansbury § 173, p. 24; *see also State v. Conrad,* 275 N.C. 342, 168 S.E. 2d 39 (1969).

Therefore, since the evidence is insufficient as a matter of law to justify a verdict for plaintiffs on their claim of civil conspiracy, the trial judge properly granted defendants' motions for a directed verdict upon this issue.

B

[5] In their eighth and ninth claims for relief, plaintiffs allege that defendants' actions constitute a wrongful interference with their business relations, contractual rights, and prospective advantage. Generally, a defendant's motive or purpose is the determining factor as to liability in actions for interference with economic relations, "and sometimes it is said that bad motive is the gist of the action." Prosser § 129, pp. 927-28. Thus, to maintain an action for interference with business relations in North Carolina, plaintiffs must show that defendants "acted with malice and for a reason not reasonably related to the protection of a legitimate business interest of [defendants]." *Smith v. Ford Motor Co.,* 289 N.C. 71, 94, 221 S.E. 2d 282, 296 (1976). Our Supreme Court has stated the essential elements of wrongful interference with contractual rights as follows:

. . . First, that a valid contract existed between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person. [Citations omitted.] *Second,* that the outsider had knowledge of the plaintiff's contract with the third person. [Citations omitted.] *Third,* that the outsider intentionally induced the third per-

son not to perform his contract with the plaintiff. [Citations omitted.] *Fourth,* that in so doing the outsider acted without justification. [Citations omitted.] *Fifth,* that the outsider's act caused the plaintiff actual damages.

*Childress v. Abeles,* 240 N.C. 667, 674, 84 S.E. 2d 176, 181-82 (1954). Where the claim is based upon wrongful interference with prospective advantage, plaintiffs must show lack of justification for inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference. *Spartan Equipment Co. v. Air Placement Equipment Co.,* 263 N.C. 549, 140 S.E. 2d 3 (1965).

A thread running through each of these actions is the requirement that plaintiffs must show a malicious, unjustifiable action by defendants resulting in the interference of plaintiffs' economic relations. Plaintiffs' strongest allegation in the present case is that such interference was defendants' combined, malicious, unjustifiable "anticompetitive" conduct as characterized above.

" 'As a general proposition any interference with free exercise of another's trade or occupation, or means of livelihood, by preventing people by force, threats, or intimidation from trading with, working for, or continuing him in their employment is unlawful.' " *Coleman v. Whisnant,* 225 N.C. 494, 506, 35 S.E. 2d 647, 656 (1945), *quoting Kirby v. Reynolds,* 212 N.C. 271, 281, 193 S.E. 412, 418 (1937). Nevertheless, our prior conclusion that plaintiffs' evidence is insufficient to support their allegation of defendants' "anticompetitive" conduct also must cause this claim to fail. Although plaintiffs have presented evidence to indicate a competition between their practice and that of Dineen and Thomas, the evidence properly before the jury is also insufficient to infer any cause and effect relationship between that competition and the denial of staff privileges at New Hanover which, plaintiffs contend, interferes with their business relations and contractual rights with their patients.[10]

---

10. The portion of the minutes of the 27 April 1964 Cape Fear medical staff meeting quoted in footnote 5, *supra,* which tends to show a connection between the orthopedic surgeons and the denial of staff privileges to plaintiffs, was correctly not before the jury because it was not properly authenticated.

As it relates to plaintiffs' claim of wrongful interference with prospective advantage, competition is a privilege, the "life of trade."

> So long as the plaintiff's contractual relations are merely contemplated or potential, it is considered to be in the interest of the public that any competitor should be free to divert them to himself by all fair and reasonable means.
>
> . . . .
>
> [S]ince all the members of a group may be free to do what any one of them may do, the addition of the element of combination or agreement of a number of defendants to carry out such policies adds nothing in itself, and will not result in liability. [Footnote omitted.] In such cases of group action, however, the possibilities of unprivileged coercion, intimidation, and a monopolistic restraint of trade are vastly increased, and the defendants frequently have been held liable on this basis.

Prosser § 130, pp. 954-55.

Again, in the present case, the evidence recounted above shows no "anticompetitive" conduct, or "group action," spurred by "unprivileged coercion, [or] intimidation . . . ." *Id.* To the extent that the evidence indicates a competition between plaintiffs' practice and that of Dineen and Thomas, we find that based upon the principles quoted above, plaintiffs' claim for wrongful interference with prospective advantage also must fail. For these reasons, plaintiffs have failed to prove the requisite interference. The trial judge therefore correctly granted defendants' motions for a directed verdict upon these issues.

C

[6]  As indicated by our above discussion, the issues of civil conspiracy and wrongful interference with economic relations by alleged "anticompetitive" conduct have similar underpinnings; the same is true where such "group action" is alleged to show a "monopolistic restraint of trade." Prosser § 130, p. 955. Thus, we now consider plaintiffs' claims that defendants engaged in a restraint of trade and in unfair methods of competition and practice in violation of G.S. 75-1 & 75-1.1.

At the time of the trial of the present case,[11] G.S. 75-1 stated, in part, as follows:

> Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal. Every person or corporation who shall make any such contract expressly or shall knowingly be a party thereto by implication, or who shall engage in any such combination or conspiracy, shall be guilty of a misdemeanor . . . .

This statute is based upon section one of the Sherman Act, 15 U.S.C.A. § 1, "[a]nd, the body of law applying the Sherman Act, although not binding upon this Court in applying G.S. 75-1, is nonetheless instructive in determining the full reach of that statute." *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 655, 194 S.E. 2d 521, 530 (1973).

The plain language of G.S. 75-1 requires that some concerted action in restraint of trade must be proven; unilateral action cannot violate the statute. *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F. 2d 105 (3d Cir. 1980), *cert. denied*, 451 U.S. 911 (1981), and the cases cited therein. *See generally State v. Atlantic Ice & Coal Co.*, 210 N.C. 742, 188 S.E. 412 (1936). "The substantive law of trade conspiracies requires some consciousness of commitment to a common scheme." *United States v. Standard Oil Co.*, 316 F. 2d 884, 890 (7th Cir. 1963), *quoted in Klein v. American Luggage Works, Inc.*, 323 F. 2d 787, 791 (3d Cir. 1963). *Accord Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., supra; Robinson v. Magovern*, 521 F. Supp. 842 (W.D. Pa. 1981).

> Direct proof of an express agreement is not required. On the contrary, the plaintiff may rely on an inference of a common understanding drawn from circumstantial evidence . . . . Nevertheless, [plaintiff has] the burden of adducing sufficient evidence from which the jury could find illegal concerted action on the basis of reasonable inferences and not mere speculation.

*Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., supra* at 111. *See also The Venzie Corp. v. United States Mineral Products Co.*, 521

---

11. In 1981, G.S. 75-1 was amended to provide that a violation of its provisions would be a "Class H felony."

F. 2d 1309 (3d Cir. 1975). We further note that in the federal jurisdiction, uniform business behavior is admissible circumstantial evidence from which an agreement may be inferred. However, such evidence alone does not make out a violation of the Sherman Act. *Coughlin v. Capitol Cement Co.*, 571 F. 2d 290 (5th Cir. 1978). Thus, it is clear that North Carolina's substantive law of civil conspiracy, outlined above, also applies in the context of G.S. 75-1.

For the same reasons that plaintiffs' evidence is insufficient to support their claims of civil conspiracy and interference with economic relations, we now must conclude that plaintiffs have not presented sufficient evidence to show the concerted action required as a threshold to their claim under G.S. 75-1. Defendants' motions for a directed verdict upon this issue were properly granted.

When plaintiffs' action accrued,[12] G.S. 75-1.1 provided, in part, as follows:

(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any *trade or commerce* are hereby declared unlawful.

(b) The purpose of this section is to declare and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business, and between persons engaged in business and the consuming public within this State, to the end that good faith and fair dealings between *buyers and sellers* at all levels of *commerce* be had in this State.

(Emphasis added.) Since the language of G.S. 75-1.1(a) is strikingly similar to that of a section of the Federal Trade Commission Act,

---

12. In 1977, G.S. 75-1.1 was revised, in part, as follows:

(a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

(b) For purposes of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.

We decline to give retroactive effect to this version of the statute. Our conclusion is based upon the principles of *Smith v. Mercer*, 276 N.C. 329, 172 S.E. 2d 489 (1970), as applied in *United Roasters, Inc. v. Colgate-Palmolive Co.*, 485 F. Supp. 1049 (E.D.N.C. 1980), *cert. denied*, --- U.S. --- (1981).

15 U.S.C.A. § 45(a)(1), our courts have held that federal decisions construing that Act are instructive upon the meaning of G.S. 75-1.1. *State of North Carolina ex rel. Rufus L. Edmisten v. J. C. Penney Co.*, 292 N.C. 311, 233 S.E. 2d 895 (1977); *Hardy v. Toler*, 288 N.C. 303, 218 S.E. 2d 342 (1975).

In *Penney*, our Supreme Court stated as follows:

> "Commerce" under federal decisions "is a term of the largest import. It comprehends intercourse for the purposes of trade in any and all its forms. . . ." *Welton v. Missouri*, 91 U.S. 275, 280, 23 L.Ed. 347, 349 (1876); *accord, Adair v. United States*, 208 U.S. 161, 177, 52 L.Ed. 436, 443, 28 S.Ct. 277, 281 (1908); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 189-90, 6 L.Ed. 23, 68 (1824). The federal courts have properly assigned the broadest possible definition to the word "commerce," since in defining the word, they define the limits of federal power to regulate activities under the commerce clause. U.S. Const. art. 1, § 8, cl. 3.
>
> . . . .
>
> By inserting the word "trade" in G.S. 75-1.1, which has a narrower meaning than the word "commerce," we believe the legislature signaled its intent to limit the otherwise broad definition of "commerce" obtained under federal decisions . . . . The use of the word "trade" interchangeably with the word "commerce" indicates that a narrower definition of commerce which comprehends *an exchange* of some type was intended.
>
> Just as in one sense the word "trade" has a limiting effect on the word "commerce," in another sense the word "commerce" enlarges the meaning of the word "trade." The two words, when used in conjunction, "include practically every business occupation carried on for subsistence or profit, and into which the elements of bargain and sale, barter, exchange, or traffic, enter." Black's Law Dictionary (4th Ed. 1968). Thus, a host of occupations would be covered by G.S. 75-1.1 that would not be subject to a statute which relied exclusively on the word "trade." . . .
>
> We believe the unfair and deceptive acts and practices forbidden by G.S. 75-1.1(a) are those involved in the bargain,

sale, barter, exchange or traffic. We are reinforced in this view by G.S. 75-1.1(b), a declaration of legislative intent having no counterpart in the federal act. . . .

The General Assembly, thus, is concerned with openness and fairness in those activities which characterize a party as a "seller."

*Id.* at 315-17, 233 S.E. 2d at 898-99. *See also Johnson v. Phoenix Mutual Life Insurance Co.*, 300 N.C. 247, 266 S.E. 2d 610 (1980). *But see United Roasters, Inc. v. Colgate-Palmolive Co.*, 485 F. Supp. 1041 (E.D.N.C. 1979). *See generally* Morgan, *The People's Advocate in the Marketplace—The Role of the North Carolina Attorney General in the Field of Consumer Protection*, 6 Wake Forest Intra. L. Rev. 1 (1969).

In the context of the Uniform Commercial Code, this Court has held that medical professionals do not engage in the sale of "goods" when they either issue a prescription for a drug, *Batiste v. American Home Products Corp.*, 32 N.C. App. 1, 231 S.E. 2d 269, *disc. rev. denied*, 292 N.C. 466, 233 S.E. 2d 921 (1977), or prepare and fit dentures, *Preston v. Thompson*, 53 N.C. App. 290, 280 S.E. 2d 780, *disc. rev. denied*, 304 N.C. 392, 285 S.E. 2d 833 (1981). *See* G.S. 25-2-105.

Inherent in the legislation is the recognition that the essence of the transaction between the retail seller and the consumer relates to the article sold, and that the seller is in the business of supplying the product to the consumer. It is the product and that alone for which he is paid. *The physician offers his professional services and skill. It is his professional services and his skill for which he is paid, and they are the essence of the relationship between him and his patient.*

*Batiste v. American Home Products Corp., supra* at 6, 231 S.E. 2d at 272, *quoted in Preston v. Thompson, supra* at 295, 280 S.E. 2d at 784 (emphasis added). Moreover, "[l]earned professions 'are characterized by the need of unusual learning, the existence of confidential relations, the adherence to a standard of ethics higher than that of the market place, and in a profession like that of medicine by intimate and delicate personal ministration.'" *Commonwealth v. Brown*, 302 Mass. 523, 527, 20 N.E. 2d 478, 481 (1939), *quoting McMurdo v. Getter*, 298 Mass. 363, 367, 10 N.E. 2d 139, 142 (1937).

Thus, in light of this authority, we do not consider defendants to be the "sellers" whose unfair and deceptive acts and practices our Supreme Court says are forbidden by the former G.S. 75-1.1. Defendants' alleged "anticompetitive" conduct is not that "involved in the bargain, sale, barter, exchange or traffic." *State of North Carolina ex rel. Rufus L. Edmisten v. J. C. Penney Co., supra* at 316-17, 233 S.E. 2d at 899. We therefore conclude that G.S. 75-1.1, as it was written when plaintiffs' action accrued, does not apply to the circumstances of the present case.

We are constrained to add that our conclusion would not be different had we retroactively applied the current version of G.S. 75-1.1(a) & (b) in this case. *See* footnote 12, *supra.* Plaintiffs contend that the so-called "learned profession" exception in the current G.S. 75-1.1(b) does not exclude defendants' alleged "anticompetitive" conduct because that conduct involves "commercial" activity, not the rendering of "professional services." We do not agree for the following reasons.

At most, plaintiffs' evidence tends to show that Dineen and Thomas have individual, like personal opinions regarding the provision of hospital staff privileges to plaintiffs. Dineen's testimony indicates that his objection to plaintiffs is grounded in their qualifications to practice podiatry in a hospital. Further, upon plaintiffs' final request for an amendment to the New Hanover medical staff bylaws to include hospital staff privileges for podiatrists, the 13 November 1978 minutes of the Executive Committee state that the Credentials Committee recommended that staff privileges for podiatrists "be granted depending upon individual qualifications." Williams' testimony also shows that the New Hanover Board of Trustees considered qualifications as a paramount issue: "As to who has to make the choice, the Board has to determine with what information comes to it, all the information it can determine, whether they feel that those asking privileges have the qualifications that the hospital has set as standard."

This evidence indicates that defendants were acting in large measure pursuant to an "important quality control component" in the administration of the hospital. Wadlington, *Cases & Materials on Law & Medicine* (1980), p. 209. As one court described it, the hospital's obligation is "to exact professional competence and the

ethical spirit of Hippocrates as conditions precedent to . . . staff privileges." *Sosa v. Board of Managers of the Val Verde Memorial Hospital,* 437 F. 2d 173, 174 (5th Cir. 1971). We conclude that the nature of this consideration of whom to grant hospital staff privileges is a necessary assurance of good health care; certainly, this is the rendering of "professional services" which is now excluded from the aegis of G.S. 75-1.1.[13] In this respect, the current version of G.S. 75-1.1 is not a substantive change from our prior law. Defendants' motions for a directed verdict upon this issue also were properly granted.

## D

[7] Plaintiffs' eleventh claim for relief states, in part, as follows:

> . . . Defendants have violated plaintiffs rights of privacy by making and permitting the making of false statements and statements calculated to cause and which have caused plaintiffs great embarrassment, which statements have cast them in a ridiculous light and wrongfully, maliciously and intentionally placed them in the position of second-class citizens and which had no relation or relevance to plaintiffs' petitions for hospital privileges.

Plaintiffs allege damage to "their persons, property and profession by these unlawful acts of defendants"; in their brief, plaintiffs contend that such acts are Dineen's alleged statement in a 1973 Cape Fear medical staff meeting " 'that he did not want to lie down with skunks,' " and his statements in letters to the New Hanover Department of Orthopedic Surgery regarding Costin's speech for the diabetes association.

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and

---

13. It is purely incidental that Dineen and Thomas' opinions, and those of New Hanover and its related defendants, indicate that plaintiffs' qualifications do not meet the standards set for the provision of staff privileges there.

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E, p. 394. Although a plaintiff need not plead and prove special damages, *Flake v. The Greensboro News Co.*, 212 N.C. 780, 195 S.E. 55 (1938), it is elementary that a compensable injury must result from the "false light" published by a defendant. *See generally* Prosser § 1, p. 4.

In the present case, plaintiffs have failed to produce any evidence that the statement and letters attributed to Dineen proximately resulted in damages to "their persons, property and profession" as they allege in their complaint. With the essential element of damages missing from plaintiffs' proof, the trial judge correctly granted defendants' motions for a directed verdict upon this issue.

### III

Plaintiffs' Assignment of Error Nos. 1, 3, and 4 make a broadside attack upon the 8 May 1979 decision of the New Hanover Board of Trustees in which the board adopted certain standards for the provision of hospital staff privileges for podiatrists and applied those standards to plaintiffs. In general, plaintiffs contend that "defendants' continued denial of clinical privileges is arbitrary, capricious and discriminatory." Specifically, plaintiffs contend that

New Hanover arbitrarily adopted and seeks to enforce by-law provisions that require these plaintiffs to complete a year of residency, be board eligible pursuant to certification from the American Board of Podiatric Surgery, and be Fellows in the American College of Foot Surgeons before they will qualify for *consideration* of the surgical privileges requested.

(Emphasis original.) They state that "the sole relevant consideration raised by their application," competency to perform surgical procedures in a hospital, has never been reviewed by New Hanover. We do not agree with plaintiffs' contentions for the following reasons.

A

[8] Our scope of review of these issues was best stated in the case of *Sosa v. Board of Managers of the Val Verde Memorial Hospital, supra,* as follows:

> No court should substitute its evaluation of such matters for that of the Hospital Board. It is the Board, not the court, which is charged with the responsibility of providing a competent staff of doctors. The Board has chosen to rely on the advice of its Medical Staff, and the court cannot surrogate for the Staff in executing this responsibility. Human lives are at stake, and the governing board must be given discretion in its selection so that it can have confidence in the competence and moral commitment of its staff. The evaluation of professional proficiency of doctors is best left to the specialized expertise of their peers, subject only to limited judicial surveillance. *The court is charged with the narrow responsibility of assuring that the qualifications imposed by the Board are reasonably related to the operation of the hospital and fairly administered.* In short, so long as staff selections are administered with fairness, geared by a rationale compatible with hospital responsibility and unencumbered with irrelevant considerations, a court should not interfere.

*Id.* at 177 (emphasis added). *Accord Laje v. R. E. Thomason General Hospital,* 564 F. 2d 1159 (5th Cir. 1977), *cert. denied,* 437 U.S. 905 (1978); *Khan v. Suburban Community Hospital,* 45 Ohio St. 2d 39, 340 N.E. 2d 398 (1976). We therefore first must determine whether the qualifications stated in the 8 May 1979 decision of the New Hanover Board of Trustees are reasonably related to the operation of the hospital.

"Training is one of those relevant professional qualifications 'which may be constitutionally applied in determining the class of people who are eligible to practice medicine in a public hospital.' " *Shaw v. The Hospital Authority of Cobb County,* 614 F. 2d 946, 952 (5th Cir. 1980), *cert. denied,* 449 U.S. 955 (1981), *quoting Foster v. Mobile County Hospital Board,* 398 F. 2d 227, 230 (5th Cir. 1968). The *Accreditation Manual for Hospitals* (1979 ed.), p. 84, prepared by the Joint Commission on the Accreditation of Hospitals, specifically suggests that specialty board certification

or eligibility "is an excellent benchmark to serve as a basis for privilege delineation . . . ."[14]

Nevertheless, in *Armstrong v. Board of Directors of Fayette County General Hospital*, 553 S.W. 2d 77, 79 (Tenn. App. 1976), which plaintiffs cite, the Tennessee Court of Appeals held that "a requirement of certification by any particular society as a mandatory prerequisite for the right of a duly licensed physician to practice his profession in a public hospital is illegal, arbitrary, capricious and beyond the jurisdiction of the governing body of the hospital" where the governing body fails to consider the competency of the candidate once the absence of the acceptable certification is established. The court did, however, endorse such a certification as a standard to be used by the hospital governing body to grant hospital staff privileges. *Id.*

In the present case, plaintiffs' evidence and the 8 May 1979 decision of the New Hanover Board of Trustees do not support plaintiffs' contention that their competency to perform surgical procedures in a hospital was never reviewed. Rather, the board's decision made an extensive review of plaintiffs' qualifications and applied that evidence to the standards established for the consideration of hospital staff privileges for podiatrists.[15] Type 1 privileges thereupon were granted. We therefore do not read *Armstrong* as supportive of plaintiffs' claim.

---

14. In fact, this suggestion was taken to heart by the New Hanover Board of Trustees in establishing the standards quoted from its 8 May 1979 decision.

15. The Board of Trustees evaluated plaintiffs' qualifications, in part, as follows:

Dr. Costin and Dr. Cameron are not recent graduates of a college of podiatry medicine. They each attended and graduated from podiatry school in the early 1950's. According to their testimony, neither received an undergraduate degree prior to entering podiatry school, and neither participated in any internship upon graduation. Neither has participated in any formal residency training. Neither has received any formal training in surgery under general anesthesia. Their postgraduate education has been primarily limited to short seminars. Neither has operated in a hospital operating room and neither has performed surgery under general anesthesia since 1964.

Although the American College of Foot Surgeons has been in existence and has been recognized by the American Podiatry Association for some years, offering associate and fellow membership status, Dr. Costin is not a member of the College. Dr. Cameron is an associate member of the College.

Other courts have gone further and held that a candidate's "personal qualities" are reasonably related to the operation of the hospital. *See Robbins v. Ong,* 452 F. Supp. 110 (S.D. Ga. 1978); *Schlein v. The Milford Hospital,* 423 F. Supp. 541 (D. Conn. 1976). In *Schlein,* the court stated, "A doctor's ability to work well with others, for instance, is a factor that could significantly influence the standard of care his patients received. *Due process does not limit the hospital's consideration to technical medical skills." Id.* at 544 (emphasis added).

Since the filing of this action, G.S. 131-126.11A has been codified as follows:

> The granting or denial of privileges to practice in hospitals to licensed physicians and other practitioners licensed by the State of North Carolina to practice surgery on human beings, and the scope and conditions of such privileges, shall be determined by the governing body of the hospital based upon the applicant's education, training, experience, demonstrated competence and ability, judgment, character and the reasonable objectives and regulations of the hospital in which such privileges are sought. Nothing in this Article shall be deemed to mandate hospitals to grant or deny to any parties privileges to practice in said hospitals.

G.S. 131-126.11B, also codified since the filing of this action, provides, in part, that "[a]ll practitioners must comply with all applicable medical staff bylaws, rules and regulations, including the procedures governing qualification methods of selection and the delineation of privileges."

These statutes reflect that the current policy of this State is in accord with the authorities discussed above. Therefore, we find that the standards established by the New Hanover Board of Trustees — membership in the American College of Foot Sur-

---

Neither Dr. Cameron nor Dr. Costin are Board eligible or Board certified by the American Board of Podiatric Surgery.

Dr. Cameron and Dr. Costin commenced office practices immediately upon graduation from their respective podiatry schools, and, while their office experience is extensive, it is the opinion of the Board that it lacks the academic depth, the intensive training and the skilled supervision that is characteristic of the medical residency programs as well as the residency programs that are now available to podiatrists.

geons, board eligible or board certified by the American Board of Podiatric Surgery, and the residency requirement for Type 2 privileges—are considerations that are reasonably related to the operation of the hospital. It is not arbitrary, capricious, and discriminatory to exclude plaintiffs from performing the surgical procedures they requested when they have been unable to comply with the standards properly established by the New Hanover Board of Trustees. *See Khan v. Suburban Community Hospital, supra.*

Plaintiffs do not specifically challenge the procedure by which the New Hanover Board of Trustees reached its conclusions and recommendations. Their sole argument in this vein is that procedural due process cannot be afforded to plaintiffs unless their competency to perform the surgical procedures they requested is reviewed by a hospital committee. Clearly, as we have noted, plaintiffs' competency has been adequately reviewed. Nevertheless, upon a review of the hearings ordered by Judge James on 29 December 1978, we find that the procedure then outlined was followed in every respect; Judge Tillery's findings to this effect are supported by our review. Judge James' guidelines for the procedure quoted above are sufficient to afford to plaintiffs procedural due process in hearings of this type. *See generally Silver v. Castle Memorial Hospital,* 53 Hawaii 475, 497 P. 2d 564, *cert. denied,* 409 U.S. 1048 (1972).

B

[9]  G.S. 90-202.12 states as follows:

No agency of the State, county or municipality, nor any commission or clinic, nor any board administering relief, social security, health insurance or health service under the laws of the State of North Carolina shall deny to the recipients or beneficiaries of their aid or services the freedom to choose the provider of care or service which are within the scope of practice of a duly licensed podiatrist or duly licensed physician as defined in this Chapter.

Plaintiffs contend that they are entitled to practice podiatry at New Hanover under the terms of this statute. They argue that the trial judge "erred in failing to enforce the terms of this statute by requiring New Hanover to grant surgical privileges to the plaintiffs."

As indicated by our above discussion, the right to enjoy hospital staff privileges is not absolute; it is subject to the standards set by the hospital's governing body. We agree with New Hanover that this is implicit in the language of G.S. 90-202.12, especially in view of the policy of this State as currently stated by G.S. 131-126.11A, quoted above. Therefore, we do not read G.S. 90-202.12 to *require* New Hanover to grant staff privileges regardless of the standards set by its Board of Trustees which are reasonably related to the operation of the hospital. Generally, the protection offered by the statute is for patients to have the freedom to choose a qualified "provider of care or service." Our holding is not inconsistent with this purpose.

IV

We have carefully reviewed plaintiffs' and defendants' remaining arguments and find them to be without merit, not warranting further discussion in this opinion.

For all the reasons set forth above, the judgment below is

Affirmed.

Judges VAUGHN and MARTIN (Harry C.) concur.