Sports Quest, Inc. v. Dale Earnhardt, Inc., 2004 NCBC 4

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION |
| COUNTY OF IREDELL | | 02 CVS 0140 |

| | | |
|---|---|---|
| SPORTS QUEST, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DALE EARNHARDT, INC., a North Carolina corporation | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | 02 CVS 0140 |
| | ) | (Consolidated) |

| | | |
|---|---|---|
| ACTION PERFORMANCE COMPANIES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPORTS QUEST, INC. | ) | |
| | ) | |
| Defendant and | ) | |
| Third-Party Plaintiff, | ) | 01 CVS 2200 |
| | ) | |
| v. | ) | |
| | ) | |
| FRED WAGENHALS | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| | ) | |

## ORDER AND OPINION

{1}     This case arises out of Plaintiff Sports Quest's claim that defendants effectively destroyed plaintiff's business as a licensee and marketer of NASCAR related merchandise.  Sports Quest asserts claims against Defendant Dale Earnhardt, Inc. ("DEI") for breach of contract, fraud, tortious interference with both business relations and prospective economic advantage, unfair and deceptive trade practices and civil conspiracy.

{2}     In a related and now consolidated case, Plaintiff Action Performance ("Action") asserts that it produced and sold $90,310.46 in replica racecars to Defendant Sports Quest but never received payment for these goods.  Action asserts claims against Sports Quest for breach of contract, statement of account and quantum meruit.  Sports Quest counterclaimed that Action and its CEO, Fred Wagenhals ("Wagenhals"), committed fraud, unfair and deceptive trade practices, tortious interference with contract and slander.  This Court dismissed the counterclaims that Sport Quest had against Action and Wagenhals in the Order and Opinion of February 12, 2004.

{3}     Sports Quest seeks monetary damages from DEI.  Action seeks to recover the allegedly past due payments for merchandise plus interest and the costs of bringing the action.

{4}     Sports Quest and DEI submitted further motions for summary judgment on the claims still pending in this matter.  Action also seeks a ruling on summary judgment as to the statement of account claim to recover the past due payments.

*Thomas, Godley & Childers, P.A. by Mark L. Childers; Eisele, Ashburn, Greene & Chapman, P.A. by Douglas G. Eisele for Plaintiff, Defendant and Third Party Plaintiff Sports Quest, Inc.*

*Alston & Bird, L.L.P by Bruce J. Rose, Judson Graves, and J. Mark Wilson for Defendant Dale Earnhardt, Inc.*

*Gray, Layton, Kersh, Solomon, Sigmon, Furr & Smith, P.A. by William E. Moore, Jr.; Arcangela M. Mazzariello for Plaintiff Action Performance Companies, Inc. and Third Party Defendant Fred Wagenhals.*

# I.

## FACTUAL BACKGROUND

### A.
### THE SPORTS QUEST AND DEI DISPUTE

{5}     Sports Quest is a North Carolina corporation with its principal office and place of business in Iredell County, North Carolina.  Sports Quest enters into licensing agreements with NASCAR racing teams to obtain the rights to market merchandise that bears the intellectual property of these organizations, including various trademarked and copyrighted items.  Kenneth Frady ("Frady") is the founder and sole owner of Sports Quest.

{6}     DEI is also a North Carolina corporation with its principal office and place of business in Iredell County, North Carolina.  DEI is a privately held company that amongst other operations exclusively controls the images and likenesses of the late Dale Earnhardt and Dale Earnhardt, Jr. and the automobiles used by their racing teams.  DEI licenses the rights for outside companies to produce, distribute and market products bearing their likenesses and other intellectual property owned by DEI.

{7}     Action is a publicly traded Arizona corporation registered to do business in the State of North Carolina.  Action designs, promotes, markets, and distributes licensed NASCAR related products.  Wagenhals is both a citizen and resident of the State of Arizona and is the president and chief executive officer as well as a major shareholder of Action.

{8}     Beginning in 1998, Sports Quest entered into several licensing agreements with DEI (the "1998 licensing agreements") to produce and market merchandise that bore images and depictions related to both Earnhardts and their respective racing teams.  Subsequent documents executed by both parties extended Sports Quest's licensing rights to the elder Earnhardt until the end of 2002 and to the younger Earnhardt until the end of 2005.  Sports Quest paid royalties based on the sale of licensed products to DEI as compensation for the licensing rights.  The president of Sports Quest, Kenneth Frady, a veteran of NASCAR merchandising, had developed a relationship with the Earnhardt family before executing the 1998 licensing agreements.

{9}     DEI asserts that Sports Quest breached several provisions of the 1998 licensing agreements.  First, DEI asserts that Sport Quest violated the agreements' prohibition on sublicensing to third party vendors.

Second, DEI alleges that Sports Quest failed to tender royalties due in accordance with the licensing agreements. Sports Quest does not dispute either violation of the 1998 licensing agreements. Frady, however, claims that Sports Quest waived the prohibition against sublicensing because DEI knew about it and did not object.

{10}     The critical juncture in this case occurred on June 15, 2000, when Frady met at the DEI offices with the elder Earnhardt and the recently hired vice president of licensing for DEI, Joe Hedrick. Frady and the elder Earnhardt signed a letter (the "June 15th letter") that allegedly altered the terms of the prior licensing agreements between DEI and Sports Quest. The parties are in dispute over the particular circumstances, inducements and motivations surrounding the meeting and resultant document.

{11}     The June 15th letter had several key provisions at issue in this case. First, Frady admitted that Sports Quest violated the prohibition on sublicensing contained in the 1998 agreements. Second, DEI required Sports Quest to send a letter to third parties stating that it had sublicensed the rights to DEI properties to third parties. The letters were to notify third parties that Sports Quest was no longer an agent of DEI, sublicensing agreements would be honored by DEI, renewals would be negotiated with DEI, and all royalty payments should be mailed directly to DEI. Third, the letter stated that a new licensing agreement between DEI and Sports Quest would follow that would supersede the 1998 agreements and also provided the terms to be included in that subsequent document. The parties never entered into a subsequent agreement that incorporated the terms provided for in the June 15th letter.

{12}     Sports Quest complied with the terms of the letter and notified sublicensees that DEI would assume control over agreements concerning properties of DEI. The licensing relationship between DEI and Sports Quest following June 15, 2000 operated without any major difficulty until early 2001. On February 18, 2001, Dale Earnhardt, Sr. was killed in an accident during a NASCAR race.

{13}     In March 2001, Sports Quest stopped paying royalties without explanation. Sports Quest did not pay the royalties even after DEI notified Sports Quest in writing that it had breached the 1998 agreements. On November 13, 2001, DEI officially terminated the relationship with Sports Quest based on violations of the 1998 licensing agreements including nonpayment and sublicensing.

{14}     The parties have opposite views as to the purpose of the June 15th letter. DEI asserts that the agreement was an attempt on its part to cure Sports Quest's breach of the prohibition on sublicensing provided for in the 1998 agreements. Sports Quest contends that DEI used the June 15th letter to induce Sports Quest to sever ties with existing customers by assuming control of these relationships. Frady claims that DEI deceived him into signing the letter by incorrectly telling him that Sports Quest was in breach of the 1998 agreements and falsely promising a secure future relationship between DEI and Sports Quest. Frady also contends that the promises made by DEI in the June 15th meeting induced him to terminate profitable relationships with customers. A factual dispute clearly exists as to the events surrounding the June 15th letter.

{15}     The dispute also turns on factual issues regarding the collapse of Sports Quest's financial health. Sports Quest maintains that DEI and Action conspired to deceive it and exercise economic duress to force Sports Quest out of business. On the other hand, DEI claims Mr. Frady's recreational habits and lack of work ethic destroyed both his relationship with the Earnhardts as well as his business.

**B.**

THE ACTION AND SPORTS QUEST RELATIONSHIP

{16}     The relationship between Action and Sports Quest dates back to 1997. Action provided die-cast

replicas of racecars to Sports Quest for resale to the Hamilton Collection ("Hamilton"). Sports Quest was simply a middleman. It had no contract; it simply submitted purchase orders when it received orders from Hamilton In March 2001, Wagenhals informed Hamilton that it would sell replica racecars directly to Hamilton. The decision to sell directly to Hamilton eliminated Sports Quest's role in the distribution of the replica cars. Action also would no longer accept purchase orders from Sports Quest to provide products to Hamilton.

{17} At the time of the decision to eliminate Sports Quest as an intermediary, Sport Quest owed over $90,000 to Action for previously shipped die-cast cars. Action seeks to recover that money in this action. The claims to recover those funds are the only matters left between Action and Sports Quest, as the Court dismissed the other claims on the motion to dismiss.

## II.

## SUMMARY JUDGMENT STANDARD

{18} Pursuant to Rule 56(c) of the North Carolina Rules of Civil Procedure, summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law. N.C. R. Civ. P. 56(e). A genuine issue is one which can be maintained by <u>substantial</u> evidence; a material fact is that which would constitute a legal defense preventing the non-moving party from prevailing. *Bd. of Ed. of Hickory Admin. School Unit v. Seagle*, 120 N.C. App. 566, 463 S.E.2d 277 (1995).

{19} The North Carolina Court of Appeals has explained that a summary judgment movant may meet its burden of showing that it is entitled to judgment as a matter of law by showing either (1) an essential element of the non-movant's claim is nonexistent, (2) the non-movant cannot produce evidence to support an essential element of his claim, or (3) the non-movant cannot surmount an affirmative defense which would bar his claim. *Taylor v. Ashburn*, 112 N.C. App. 604, 606-607, 436 S.E.2d 276, 278 (1993), *cert. denied*, 336 N.C. 77, 445 S.E.2d 46 (1994). Once defendants have met their burden by proving that an essential element of the opposing party's claim is nonexistent or by showing through discovery that the opposing party cannot produce evidence to support an essential element of its claim, the burden shifts to the non-moving party to show that a genuine issue exists by forecasting sufficient evidence of all essential elements of the claim. *Farrelly v. Hamilton Square*, 119 N.C. App. 541, 459 S.E.2d 23 (1995). The non-moving party may not rest upon mere allegations or denials in its pleadings but instead is required to offer evidence tending to establish, beyond mere speculation or conjecture, the essential elements of its claims. N.C. R. Civ. P. 56(e).

## III.

## SPORTS QUEST AND DEI DISPUTE

### A.
### BREACH OF CONTRACT CLAIM & DEI's
### COUNTERCLAIM

{20} Sports Quest's most central claim in this matter is that DEI breached its contract with Sports Quest. DEI counterclaims that Sports Quest breached the contract by violating several provisions in the

licensing agreement including the prohibition on sublicensing. The elements of breach of contract are the existence of a valid contract and breach of the terms of the contract. *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). A breach of contract is only actionable if a material breach occurs—one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform. *Fletcher v. Fletcher*, 123 N.C. App. 744, 752, 474 S.E.2d 802, 807-08 (1996), *disc. rev. denied,* 345 N.C. 640, 483 S.E.2d 706 (1997).

{21}     The breach of contract claim against DEI is subject to disputed facts. The circumstances surrounding the alleged breach are still unclear. Both sides present different versions of the impetus for events that led to this claim. For example, the Court cannot rule on arguments such as the waiver of the sublicensing prohibition or good faith and fair dealing as matter of law while a factual dispute still exists. The Court cannot speculate as to what events occurred that led to sublicensing or a failure to exercise the termination provisions, nor is the record clear on what DEI knew about Sport Quest's licensing agreements.

{22}     Similarly, DEI's counterclaim for breach of contract also raises questions of fact that do not permit a finding of summary judgment. The circumstances surrounding Sports Quest's alleged breach are as unclear as the facts concerning the breach allegations against DEI. It is clear that Frady stopped paying royalties, but the reasons therefore and the determination of whether or not there existed a prior breach by DEI involve credibility issues that the jury must resolve.

{23}     The summary judgment standard does not permit the Court to resolve the factual issues in this phase of litigation. The claim and counterclaim for breach of contract both involve the resolution of genuine issues of material fact.

## B.

## FRAUD

{24}     The claim of fraud also raises factual issues that at this juncture remain unresolved. In North Carolina, the courts define fraud as a false representation or concealment of a material fact, reasonably calculated to deceive, made with the intent to deceive which does in fact deceive, resulting in damage to the injured party. *Myers & Chapman v. Evans*, 323 N.C. 559, 568, 374 S.E. 2d 386, 390 (1988). The intent to deceive is an essential element of fraud. *Id.*, 374 S.E.2d at 392. The North Carolina Supreme Court disavowed cases that only implicitly recognized intent to deceive. *Id.*

{25}     The essential nature of intent to deceive to a fraud claim makes finding summary judgment in favor of either party a difficult proposition. The facts of this case are clearly in dispute as to how DEI induced Sports Quest to sign the June 15th letter. More importantly, the motivations behind DEI's action are unclear and do not provide a basis in which to resolve this claim before trial. The motivations of DEI regarding this agreement are crucial to the intent element of the fraud claim.

{26}     The factual record is not sufficiently clear for the Court to rule on any element of the fraud claim, especially the element of the intent to deceive.

## C.

## TORTIOUS INTERFERENCEWITH PROSPECTIVE ECONOMIC ADVANTAGE

{27}     Plaintiff Sports Quest asserts that DEI's actions rise to the level of a business tort that interfered with its ability to avail itself of economic gain. North Carolina sets a high standard for maintaining a tortious interference with prospective advantage claim:

> In order to maintain an action for tortious interference with prospective advantage, Plaintiff must show that Defendants induced a third party to refrain from entering into a contract with Plaintiff without justification. *Cameron v. New Hanover Memorial Hospital,* 58 N.C. App. 414, 440, 293 S.E.2d 901, 917 (1982). Additionally, Plaintiff must show that the contract would have ensued but for Defendants' interference. *Id.*

*DaimlerChrysler v. Kirkhart*, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002).

{28}     Essential to the claim is first identifying a contract that the defendant induced a third party to refrain from entering.  Plaintiff fails to identify the requisite future contract in this matter.  Sports Quest alleges that DEI interfered with existing contracts and cites specific agreements in an attempt to support this claim.  Plaintiff, however, fails to identify *future* contracts with any specificity.[1]  Sports Quest's expectation of future contracts with current customers does not suffice to maintain a tortious interference with prospective advantage claim.  *Dalton v. Camp*, 353 N.C. 647,655, 548 S.E.2d 704, 710 (2001).

{29}     Sports Quest, moreover, fails to prove that DEI caused Sport Quest's failure to secure future contracts with third parties.  Contracts obviously did exist between Sports Quest and third parties, but merely proving these agreements existed does not support the assertion that the relationship would continue.  *See id.*  Plaintiff must offer specific evidence that Sports Quest had a future relationship with these customers and that DEI caused these customers to refrain from entering into further contracts.  Sports Quest failed to offer evidence that these relationships involved future contracts.  Thus, the Court cannot possibly find that DEI caused customers to refrain from entering into contracts with Sports Quest because no evidence offered proves further contractual relations.

**D.**

TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONS

{30}     The claim of tortious interference with existing business relations provides redress when a defendant induces a third party to not perform an existing contract with the plaintiff.  North Carolina law specifies five elements required to prevail on this claim.  *Beck v. City of Durham,* 154 N.C. App. 221, 232, 573 S.E.2d 183, 191 (2002).  First, a valid contract must exist between the plaintiff and a third party that provides the plaintiff with contractual rights.  Second, the defendant must have knowledge that the contract exists.  Third, the defendant must intentionally induce the third party not to perform the contracts.  Fourth, the defendant must induce the nonperformance of the contract without justification.  Fifth, the third party's failure to perform the contract results in actual damage to the plaintiff.  *Id*.

{31}     The first fatal flaws in Sports Quest's claim for tortious interference with existing business relations is that not all of their relationships with third parties included contracts.  The first element requires that a valid contract exist.  Most notably, Sports Quest's relationships with Action and Hamilton did not involve contracts, but the parties memorialized their separate transactions with purchase orders.

{32}     As discussed in the opinion issued by this Court in February 2004, the mere acknowledgement or receipt of a purchase order does not constitute assenting to the terms of an offer and thus does not create a contractual obligation.  *See Southern Spindle & Flyer Co. v. Milliken & Co.,* 53 N.C. App. 785, 788, 281 S.E.2d 734, 736 (1981).  In *Southern Spindle*, the defendant orally contracted with the plaintiff provider for the servicing of the defendant's machines.  *Id*. at 786-88, 281 S.E.2d at 735-36.  Plaintiff acknowledged receipt but did not indicate a promise to comply with the terms proscribed in the purchase order.  *Id*., 53 N.C. App. at 788, 281 S.E.2d at 738.  Defendant cancelled the remainder of the oral contract and plaintiff brought an action to recover the money owed under the agreement.  The defendant filed a motion to dismiss because the purchase order included an arbitration clause.  The *Southern Spindle* court denied the motion to dismiss and held that the acknowledgement of a purchase order did not mean that a party assents to the terms provided.  *Id*.

{33}     As in *Southern Spindle*, Sports Quest's reliance on an acknowledged purchase order is incorrect.  Acknowledged purchase orders do not create by themselves contractual obligations.  The purchase orders

were the documents that governed the relationships between Action and Sports Quest or Hamilton and Sports Quest. Moreover, Action did not accept, sign or acknowledge these purchase orders. Regarding the relationship with Action or Hamilton, Sports Quest cannot maintain a claim for tortious interference with existing business relations because neither had a contractual obligation to Sports Quest.[2]

{34}     The fourth element requires that the plaintiff act without justification and do so with "no motive for interference other than malice." *Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 674, 541 S.E.2d 733, 738 (2001). The relationships in which Sports Quest bases its claim for tortious interference with existing business relations do not demonstrate that DEI's motivation was malicious because DEI acted to protect a legitimate business interest. *See Area Landscaping v. Glaxo-Wellcome, Inc.*, 586 S.E.2d 507, 510, 2003 LEXIS 1825, at *5 (2003); *Robinson, Bradshaw & Hinson v. Smith*, 129 N.C. App. 305, 318, 498 S.E.2d 841, 850 (1998).

{35}     In *Area Landscaping*, the plaintiff alleged that the defendant Brickman, a rival landscaping business, interfered with its contract with Glaxo-Wellcome. 586 S.E.2d at 510, 2003 LEXIS 1825, at *5. Brickman obtained the Glaxo-Wellcome contract by underbidding the plaintiff. The court found that the plaintiff failed to offer any evidence that Brickman acted with malice as opposed to a legitimate business interest. Thus, the court affirmed the trial court's summary judgment ruling in favor of the defendant because bidding for the contract was a legitimate business interest and did not constitute malicious interference. *Id.*

{36}     Similarly in the case at hand, Sports Quest offers no evidence that DEI acted *only* with malicious intent. DEI's actions obviously harmed Sports Quest's financial condition. The harm against Sports Quest does not suffice to maintain the intentional interference with existing business relations. These same actions, however, obviously benefited the business interests of DEI in two respects.

{37}     First, the elimination of Sports Quest from the intermediary role with Action is a common method of preserving relationships in today's economy. Contracting the distribution chain provides such benefits as improved control over licensing and strengthening preferred distribution relationships. Sports Quest, moreover, fails to offer specific evidence that DEI acted only with malice in eliminating their intermediary role or that DEI directly interfered with the Hamilton and Sports Quest relationship. Thus, without evidence of malicious intent, Sports Quest cannot maintain an action for intentional interference with existing business relations.

{38}     Second, the allegation that the interference with the sublicensees was malicious fails because DEI's actions advanced a legitimate business interest. Sublicensing is a means in which the original licensor can lose control over its brand. The inability of the original licensor to approve or reject items bearing its trademark can lead to the dilution of the value of the intellectual property. For example, a massive flooding of the market by sublicensees with items of inferior quality bearing the trademark would likely reflect adversely on other products bearing the trademark. The mere possibility that this might occur provided DEI with a legitimate business interest regarding the sublicensees.

{39}     Even more detrimental to the licensor is that an oversupply of similar goods bearing the trademark can lower the price that trademark will command in the market. Simple economics dictates that if an uncontrolled supply exceeds the demand in the market then consumers will not pay the original price, thereby creating downward pressure on the value of the trademarked goods. The sublicensing of DEI's trademarks by Sports Quest created the risk that DEI could lose control over its intellectual property, hence endangering its value.

{40}    Sports Quest cannot assert that DEI did not advance a legitimate business interest by its attempts to control the relationships with sublicensees.  Regardless of whether DEI waived its prohibition on sublicensing with Sports Quest, the decision to disallow Sports Quest from continuing to do so was not without justification.  Whether DEI waived the prohibition on sublicensing is inconsequential to this claim because sublicensing has the potential to harm the value of intellectual property and thus provides a business justification for the action.  The prevention of loss of value is a legitimate business interest that is beyond only malicious intentions.

{41}    Sports Quest failed to offer evidence that a contract existed in its relationship with both Action and Hamilton.  In addition, Sports Quest did not support the proposition that DEI acted only with malicious intent in its actions regarding the Action and Hamilton relationships.  The analysis of this claim pertaining to Action and Hamilton, however, does not even require a legitimate business interest because no contract existed in these relationships.

{42}    Sports Quest proved that it had a contractual obligation with its sublicensees.  DEI, however, had a legitimate business interest in licensing directly to protect the value of its intellectual property assets.  Therefore the Court finds in favor of DEI's motion for summary judgment on the intentional interference with business relations claim.  It is also clear that DEI had the right to, and a legitimate business interest in, directly licensing its property.

## E.
## CIVIL CONSPIRACY

{43}    North Carolina does not recognize civil conspiracy as an independent cause of action.  *Toomer v. Garrett*, 155 N.C. App. 462, 483, 574 S.E.2d 76, 92 (2002).  A civil conspiracy claim requires that the plaintiff prove an underlying unlawful conduct by alleging both the agreement of two or more parties to carry out the conduct and an injury resulting from that action.  *Id.*  Plaintiff fails to offer evidence that an agreement existed between DEI and Action to commit unlawful acts that injured Sports Quest.  Thus the civil conspiracy claim fails for two reasons.

{44}    First, this Court found that Action did not commit an unlawful act regarding Sports Quest.  Action's decision to deal directly with Hamilton did not constitute an unlawful act.  Second, Sports Quest does not offer any evidence that Action and DEI entered into an agreement to commit an unlawful act.  Thus Sports Quest does not as a matter of law have a claim for civil conspiracy against DEI.

## F.
## UNFAIR AND DECEPTIVE TRADE PRACTICE

{45}    A plaintiff must establish three elements to maintain an unfair trade practices claim.  First, the plaintiff must show that the defendant committed an unfair or deceptive practice or act.  *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). Second, the alleged action must occur in or affect commerce.  Third, the alleged act must injure the plaintiff.  *Id.*  A practice is unfair if it is unethical or unscrupulous and is deceptive if it has the tendency to deceive.  *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981).

{46}    In this case, the unfair trade practice is dependent upon the fraud claim.  Sports Quest must prove the fraud claim to sustain an unfair trade claim.  The other allegations against DEI do not rise to the level of an unfair trade practice, as the actions were in the ordinary course of business.  The fraud allegations, if proven true, provide an avenue for Sports Quest to prevail on the unfair trade claim.  If the jury found fraud in connection with the June 15, 2000 amendment, it would be up to the Court to determine if that

fraud supported an unfair trade claim. If the Court found an unfair trade practice, Sports Quest would then elect between its fraud damages and its unfair trade damages. The unfair trade claim is reliant on the success of the fraud claim and hence subsumed by it as well.

## IV.
## ACTION'S MOTION FOR SUMMARY JUDGMENT ON
## MONEY OWED ON ACCOUNT

{47}     The Court dismissed all of Sports Quest's claims against Action in the February 12, 2004 Order. Sports Quest's only defense to the claim that it owed Action the sum of $90,310.46 for die cast racecars was that the pending claims should not be resolved until the Court determined Action's liability to Sports Quest. Sports Quest maintained that it should not have to pay Action, as the sum owed would serve as a set off to Action's liability to Sports Quest as the result of a verdict in its favor. No claims exist that would hold Action liable to Sports Quest for any sum. In addition, no issue of genuine material fact exists as to whether Sports Quest owes Action the sum of $90,310.46 for die cast racecars. Sports Quest does not deny that it owes Action this sum.

{48}     Given that Sports Quest no longer has any claim pending against Action, the Court grants summary judgment in favor of Action on the statement on account claim. Thus Sports Quest is liable to Action for the sum of $90,310.46 plus interest as provided by law.

## CONCLUSION

Based upon the foregoing, it is hereby ORDERED, ADJUDGED and DECREED:

1. Summary judgment in favor of Sports Quest is DENIED on Sports Quest's claim against DEI for breach of contract;

2. Summary judgment in favor of DEI is DENIED on Sports Quest's claim against DEI for breach of contract;

3. Summary judgment in favor of Sports Quest is DENIED on DEI's breach of contract counterclaim;

4. Summary judgment in favor of DEI is DENIED on DEI's breach of contract counterclaim;

5. Summary judgment in favor of Sports Quest is DENIED on the issue of DEI's waiver of the sublicensing provision;

6. Summary judgment in favor of Sports Quest is DENIED on Sports Quest's claim against DEI for fraud;

7. Summary judgment in favor of DEI is DENIED on Sports Quest's claim against DEI for fraud;

8. Summary judgment in favor of DEI is GRANTED on Sports Quest's claim against DEI for tortious interference with prospective economic advantage;

9. Summary judgment in favor of DEI is GRANTED on Sports Quest's claim against DEI for tortious interference with business relations;

10. Summary judgment in favor of DEI is GRANTED on Sports Quest's claim against DEI for civil conspiracy;

11. Summary judgment in favor of DEI is DENIED on Sports Quest's unfair trade practice claim against DEI;

12. Summary judgment in favor of Sports Quest is DENIED on Sports Quest's unfair

trade practice claim against DEI;

13. Summary judgment in favor of DEI is DENIED on Sports Quest's request for punitive damages;

14. Summary judgment in favor of Action is GRANTED on Action's claim against Sports Quest for statement on account.

This the _____ day of March 2004.

---

[1] Sports Quest makes a very general and speculative allegation regarding future contracts: "DEI tortiously interfered with SQI's prospective economic advantage by preventing SQI from entering into future contracts with the third-party manufacturers and distributors with whom SQI had existing contracts on June 15, 2000, future contracts with the third-party manufacturers and distributors, future contracts with Action for the purchase of die cast, and future contracts with Hamilton and others for the sale of Action die cast." Sports Quest Brief in Response to DEI and Hedrick's Motion for Summary Judgment on Plaintiff's Claims, p.20. Plaintiff then proceeds to discuss the existing contracts with Sports Quest that DEI allegedly caused third parties to breach. Sports Quest fails to show that these contracts had a future beyond the existing term and operates under the assumption that they would inevitably be renewed.

[2] The Court ruled in the last opinion that Action did not breach a contract and that when Sports Quest settled with Hamilton, it waived the right to seek redress for intentional interference.