IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA17-744

Filed: 16 October 2018

Richmond County, No. 14 CVS 892

HAMLET H.M.A., LLC D/B/A SANDHILLS REGIONAL MEDICAL CENTER, Plaintiff,

v.

PEDRO HERNANDEZ, M.D., Defendant.

Appeal by defendant from judgment and order entered 9 January 2017 by Judge Richard T. Brown in Superior Court, Richmond County. Heard in the Court of Appeals 21 March 2018.

> *Thomerson Freeman & Rogers P.C., by William S. F. Freeman, for plaintiff-appellee.*
>
> *Mark L. Hayes, for defendant-appellant.*

STROUD, Judge.

Defendant Pedro Hernandez, M.D. ("defendant") appeals a judgment upon a jury verdict finding him liable for breach of contract and an order denying his motions for judgment notwithstanding the verdict and for a new trial. Defendant has raised three issues on appeal regarding the judgment and order. First, defendant has failed to demonstrate that the trial court abused its discretion in denying his motion for new trial based upon his claim of a compromise verdict. Second, the trial court improperly dismissed defendant's Unfair and Deceptive Trade Practices ("UDTP")

counterclaim based upon the "learned profession" exception to N.C. Gen. Stat. § 75.1-1. Last, defendant failed to preserve his argument regarding erroneous admission of parol evidence. We therefore reverse and remand in part and affirm in part the trial court's judgment.

## I. Background

Defendant is a physician who moved from Maine to North Carolina to be closer to his family. He had been practicing in Maine since 2008. In March of 2011, before he and his wife moved, defendant used an online portal called MedHunters to look for open medical positions in North Carolina. He sent seven hospitals an interest email, including plaintiff Sandhills Regional Medical Center, a hospital owned and operated by plaintiff Hamlet H.M.A. LLC.[1] Plaintiff responded immediately, and on 16 March and 17 March 2011, plaintiff paid for defendant to visit the Hospital and plaintiff. Plaintiff made an offer to defendant five days after his visit.

The original offer was for defendant to set up his own independent practice and to be an independent contractor for plaintiff. The offer guaranteed a minimum collection amount for the first 18 months of the 36-month contract. The income guarantee was described in the email with the offer attached. Mr. Michael McNair, the CEO of the Hospital at the time, testified: "the theory is, as his practice develops over a period of time and his practice starts bringing in more money from him seeing

---

[1] We will refer to Hamlet H.M.A., LLC as "plaintiff" and the Sandhills Regional Medical Center operated by plaintiff as "the Hospital."

patients and doing surgery and those kind of things, then the amount that you get paid [by plaintiff] gets less."

Plaintiff also offered defendant an employment option as an addendum to the original offer, which plaintiff could exercise at the end of the first 18 months of the contract. The employment option section specified that the option would "at a minimum, include the following material terms and conditions: Proposed Duration: 18 months. Proposed Compensation Methodology for Employment Agreement: Base Salary $325,000 with a bonus based on worked RVUs." [2]

Defendant clarified in two emails dated 23 March 2011 and 24 March 2011 that he was not comfortable with this arrangement. Instead, he asked to be an employee with a regular salary like the other doctors employed by Plaintiff. Plaintiff sent defendant an employment offer on 25 March 2011 with a base salary of $275,000 and several other incentives. Defendant responded four hours later that he did not think it made sense to accept less money for an employee position or status.

Defendant then sent plaintiff an email asking to extend the time period of guaranteed income to 24 months, rather than 18 months. Plaintiff replied that it could not extend the period but raised the monthly salary from $47,616.82 to

---

[2] Mr. McNair testified that "RVUs" refers to "relative value units" and explained that this portion of the agreement was "the bonus piece that's based upon your productivity RVUs, relative value units. That's a fairly common term in physician contracting language."

$49,500.00 and also added a signing bonus of $30,000.00. After further negotiations, the parties entered into a Physician Recruitment Agreement on 29 March 2011.

Defendant started his practice at the Hospital on 1 September 2011 and was to work until 1 September 2014 based upon the 36-month contract requirement. The practice was not successful, and at the end of the first 18-month period, defendant timely notified plaintiff of his desire to exercise the employment option in his contract. But plaintiff did not give defendant an employment contract at the end of the 18-months. The Physician Recruitment Agreement defendant signed required plaintiff to offer defendant an employment contract on one of plaintiff's standard template forms at the end of the first 18 months, should defendant exercise the option. Plaintiff believed the Physician Recruitment Agreement itself to be the employment contract, since it was on a standard template form and stated the amount his salary would be as an employee, so plaintiff did not send defendant an employee contract.

Defendant closed his practice in April 2013, so defendant did not practice for the full 36-month period. Plaintiff informed defendant that whether defendant became an employee of Plaintiff or not, he was still required to practice for the 36 month period. When defendant did not receive an 18-month employment contract from plaintiff, he began looking for other work. Plaintiff made several requests to

defendant demanding repayment of its loans made during defendant's first 18 months of practice, but defendant did not repay them.

On 29 August 2014, plaintiff filed a complaint against defendant alleging breach of contract and demanding repayment of the entire amount paid to defendant, a total of 21 payments amounting to $902,259.66. Defendant filed an answer with counterclaims for breach of contract, fraud, unfair or deceptive trade practices, and unjust enrichment. A jury trial was held in Superior Court in Richmond County at the end of August and beginning of September 2016. The jury returned a verdict for plaintiff for $334,341.14. Defendant filed a Motion for Judgment Notwithstanding the Verdict and a Motion for New Trial on 8 September 2016. On 9 January 2017, the trial court entered judgment on the jury verdict and issued an order denying both of defendant's post-trial motions. Defendant timely appealed to this Court from both the order denying the motions and the judgment.

## II. Compromise Verdict

Defendant contends that the jury reached an impermissible compromise verdict when it found that defendant owed $334,341.14, instead of $902,259.66.

a. Standard of Review

We review an appeal from denial of a motion for new trial based upon an alleged compromise verdict for abuse of discretion. *See Smith v. White*, 213 N.C. App. 189, 195, 712 S.E.2d 717, 721 (2011) ("An appeal from a trial court's denial of a motion

for new trial because of an alleged compromise verdict is reviewed for an abuse of discretion.").  The party seeking to show an abuse of discretion has the burden of demonstrating that the verdict was a compromise.  *Id.*  Our Supreme Court has stressed that we should not review this discretionary ruling except in "rare cases":

> It has been long settled in our jurisdiction that an appellate court's review of a trial judge's discretionary ruling either granting or denying a motion to set aside a verdict and order a new trial is strictly limited to the determination of whether the record affirmatively demonstrates a manifest abuse of discretion by the judge.  The legislative enactment of the Rules of Civil Procedure in 1967 did not diminish the inherent and traditional authority of the trial judges of our state to set aside the verdict whenever in their sound discretion they believe it necessary to attain justice for all concerned, and the adoption of those Rules did not enlarge the scope of appellate review of a trial judge's exercise of that power.  The principle that appellate review is restricted in these circumstances is so well established that it should not require elaboration or explanation here.  Nevertheless, we feel compelled by the Court of Appeals' disposition of the case before us to restate and reaffirm today the basic tenets of our law which would permit only circumscribed appellate review of a trial judge's discretionary order upon a Rule 59 motion for a new trial.  Those tenets have been competently set forth in innumerable prior opinions of this Court, and, for instructive purposes, we provide the following sampling therefrom.

> In *Settee v. Electric Ry.*, 170 N.C. 365, 367, 86 S.E. 1050, 1051 (1915), the Court evinced a positive hesitancy to review such discretionary rulings by the trial court except in rare cases:  While the necessity for exercising this discretion, in any given case, is not to be determined by the mere inclination of the judge, but by a sound and enlightened judgment in an effort to attain the end of all

> law, namely, the doing of even and exact justice, we will yet not supervise it, except, perhaps, in extreme circumstances, not at all likely to arise; and it is therefore practically unlimited.

*Worthington v. Bynum*, 305 N.C. 478, 482, 290 S.E.2d 599, 602-03 (1982) (citations and quotation marks omitted).

    b.    Analysis

Defendant contends the jury's verdict is a compromise verdict so it must be set aside. "A compromise verdict is one in which the jury answers the issues without regard to the pleadings, evidence, contentions of the parties or instructions of the court. The dollar amount of the verdict alone is insufficient to set aside the verdict as being an unlawful compromise." *Smith*, 213 N.C. App. at 195, 712 S.E.2d at 721 (citations and quotation marks omitted).

> Where it appears that the verdict was the result of a compromise, such error taints the entire verdict and requires a new trial as to all of the issues in the case. If the award of damages to the plaintiff is grossly inadequate, so as to indicate that the jury was actuated by bias or prejudice, or that the verdict was a compromise, the court must set aside the verdict in its entirety and award a new trial on all issues.

*Robertson v. Stanley*, 285 N.C. 561, 569, 206 S.E.2d 190, 195-96 (1974) (citation and quotation marks omitted).

Defendant argues that the verdict here is a compromise verdict much like an example noted in *Bartholomew v. Parrish*, 186 N.C. 81, 118 S.E.2d 889 (1923). The Court in that case set forth this example:

> [I]f a suit were brought upon a promissory note, which purported to be given for $100, and the only defense was that the defendant did not execute the note, and the jury should return a verdict for $50 only, it would not be allowed to stand; for it would neither conform to the plaintiff's evidence, nor to that of the defendant. It would be a verdict without evidence to support it; and it is not to be tolerated that the jury should thus assume in disregard of the law and evidence, to arbitrate the differences of parties, or to decide according to some supposed natural equity, which in reality is merely their own whim.

*Id.* at 84, 118 S.E.2d at 900; s*ee also Smith*, 213 N.C. App. at 195, 712 S.E.2d at 721 ("A compromise verdict is one in which the jury answers the issues without regard to the pleadings, evidence, contentions of the parties or instructions of the court."). Defendant argues that but for the numbers, this case is almost identical to the example in *Bartholomew*, 186 N.C. at 84, 118 S.E.2d at 900. At trial, the parties entered into a stipulation that plaintiff loaned defendant $902,259.66. Defendant disputed only that he had a legal obligation to repay plaintiff any of the payments. He argued he had no obligation to pay plaintiff at all because plaintiff breached the contract first by not fulfilling its obligation to give him an employment contract at the end of the first 18 months. The employment contract was an optional provision, but defendant had notified plaintiff of his intention to exercise the option in a timely

fashion. Defendant argues that based upon the issues and the stipulation of the amount of potential damages plaintiff may recover, the jury could return a verdict for $902,259.66 or for nothing at all. *See also Wiles v. Mullinax*, 275 N.C. 473, 485-86, 168 S.E.2d 366, 375-76 (1969) (determining that because the damages were stipulated at trial, they were not of issue and would not be reconsidered in a new trial). Because the verdict was $334,341.14, defendant contends the jury apparently came to a compromise by including the amounts on some of the checks in evidence at the trial but excluding others.

Plaintiff contends that defendant has not demonstrated a compromise verdict simply by the amount of damages so the trial court did not abuse its discretion by denying his motion for new trial.[3] Although the parties had stipulated that the total sum paid to defendant was $902,259.66, the 21 payments plaintiff paid to defendant were also in evidence, and the parties presented much testimony and other evidence regarding the various obligations and amounts related to each. The Physician Recruitment Agreement included payments and financial obligations of several different types, and the checks included amounts based upon different portions of the Agreement. For example, plaintiff notes that it "agreed to provide several categories of financial assistance to [defendant] under the terms of the Recruitment Agreement,

---

[3] Plaintiff's brief notes that plaintiff did not cross-appeal from the judgment, despite the fact that the jury did not award the total $902,259.66, and it is difficult to see how defendant is an "aggrieved party" since the verdict was far less than it should have been based upon defendant's argument regarding the compromise verdict.

including: (i) reimbursement of relocation expenses, up to $15,000; (ii) reimbursement of expenses incurred to market the new practice, up to $10,000; (iii) reimbursement of start-up expenses incurred with setting up a new practice, up to $10,000; (iv) a sign-on bonus of $30,000; and (v) for the first eighteen (18) months of the thirty-six (36) month period, a monthly income guarantee of $49,500 against cash collections." In addition, defendant had agreed to be on emergency call at the Hospital and to accept calls for unassigned patients. The parties presented extensive evidence over nine days regarding the various obligations and payments. The verdict sheet had 12 separate issues, and the jury's answers to all of the issues were internally consistent. The jury never indicated any confusion about the issues under consideration.

Plaintiff also notes that this case is not at all like *Bartholomew*, the case with the example quoted above and noted by defendant. In *Bartholomew*, the jury's compromise was obvious both from the number and the notation on the verdict sheet: "In answer to the issue, the jury rendered a verdict in word and figures as follows: '*Compromise*, $283.25.'" *Bartholomew*, 186 N.C. at 83, 118 S.E. at 900 (emphasis added). In addition to labeling the verdict as a "[c]ompromise," the way the jury had calculated the compromise was obvious: "[T]he sum of $283.25 is arrived at by taking one-half of the $366.51 and adding to it $100, the sum admitted by the defendant to be due to the plaintiffs." *Id.* at 84, 118 S.E. at 900.

Here, the only evidence defendant can offer of a compromise is the amount of the damages, and given the complex evidence and issues presented, the amount alone does not convince us that the jury reached a compromise verdict. *See Piedmont Triad Reg'l Water Auth. v. Lamb*, 150 N.C. App. 594, 598, 564 S.E.2d 71, 74 (2002) ("The dollar amount of the verdict alone is insufficient to set aside the verdict as being either an unlawful compromise or a quotient verdict."). The cases cited by plaintiff in which the amount of damages could show a compromise verdict involved simple single-issue verdicts. In addition, had the trial court granted defendant's motion, it would logically have granted a new trial on damages only and not on defendant's liability. *See, e.g., Handex of Carolinas, Inc. v. County of Haywood*, 168 N.C. App. 1, 20, 607 S.E.2d 25, 36-37 (2005) ("A new trial as to damages only should be ordered if the damage issue is separate and distinct from the other issues and the new trial can be had without danger of complication with other matters in the case. It must be clear that the error in assessing damages did not affect the entire verdict." (Citations omitted)). Defendant argues that new trial should have been granted on all issues because of how "interconnected" the issues were, but it is this very "interconnectedness" that also makes it impossible to determine a compromise verdict simply from the amount of the verdict. The jury's answers as to liability were clear, and defendant does not challenge those issues on appeal, other than as noted in the parol evidence argument, so there would have been no need for a new trial on all

issues. *See generally id.* The trial court may have considered a new trial on damages only to be unfair to defendant, considering the complexity of the evidence. This is not one of those rare cases in which we can say that the trial court abused its discretion by denying defendant's motion. *See Smith*, 213 N.C. App. at 195, 712 S.E.2d at 721.

III.  Unfair and Deceptive Trade Practices ("UDTP") Claim

Defendant argues the trial court erred by granting entry of directed verdict dismissing his UDTP counterclaim "based on a misapplication of the 'learned profession' exclusion." (Original in all caps).

a.  Standard of Review

> The standard of review of directed verdict is whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury. On appeal the standard of review for a JNOV is the same as that for a directed verdict, that is whether the evidence was sufficient to go to the jury. A motion for directed verdict or JNOV should be denied unless the evidence, taken as true and viewed in the light most favorable to the plaintiff, establishes an affirmative defense as a matter of law. Our review is *de novo*.

*King v. Brooks*, 224 N.C. App. 315, 317-18, 736 S.E.2d 788, 791 (2012) (citations and quotation marks omitted).

b.  The Learned Profession Exception

The trial court granted the motion for a directed verdict based upon the learned professional exception to a claim for Unfair and Deceptive Trade Practices. Chapter 75 of the North Carolina General Statutes states:

> (a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.
> (b) For purposes of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a *learned profession*.

N.C. Gen. Stat. § 75-1.1(a), (b) (2017) (emphasis added).

In *Reid v. Ayers*, this Court noted a two-part test to determine when the learned profession exception applies: "In order for the learned profession exemption to apply, a two-part test must be satisfied. First, the person or entity performing the alleged act must be a member of a learned profession. Second, the conduct in question must be a rendering of professional services." 138 N.C. App. 261, 266, 531 S.E.2d 231, 235 (2000) (citations omitted).

There is no dispute that doctors and hospitals are members of a learned profession. *See Wheeless v. Maria Parham Med. Ctr., Inc.*, 237 N.C. App. 584, 589 768 S.E.2d 119, 123 (2014); *see also Burgess v. Busby*, 142 N.C. App. 393, 407, 544 S.E.2d 4, 11-12 (2001); *Gaunt v. Pittaway*, 139 N.C. App. 778, 784, 534 S.E.2d 660, 664 (2000); *Abram v. Charter Medical Corp. of Raleigh*, 100 N.C. App. 718, 722-23, 398 S.E.2d 331, 334 (1990). The first prong of the learned profession exception is satisfied, since both parties are members of a learned profession. *See generally Reid*, 138 N.C. App. at 266, 531 S.E.2d at 235.

The second prong of the test is less clear. None of the cases cited by the parties which address the learned profession exception deal with a dispute arising from a contractual arrangement like this one among members of a learned profession. Since the claims must arise out of "professional services rendered" by a physician, *see* N.C. Gen. Stat. § 75-1.1 (b), where a claim does not arise directly from rendition of professional services, defendant argues that one member of a learned profession may bring a UDTP claim against another member of a learned profession regarding a business dispute unrelated to rendition of medical services.

The pertinent parts of N.C. Gen. Stat. § 75-1.1 provide:

> (a) Unfair methods of competition in or affecting commerce, and *unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.*

> (b) For purposes of this section, "commerce" includes all business activities, however denominated*, but does not include professional services rendered by a member of a learned profession.*

N.C. Gen. Stat. § 75-1.1(a)-(b) (emphasis added).

The issue of first impression presented by this appeal is whether the "learned profession" exception set forth in N.C. Gen. Stat. § 75-1.1(b) applies to a dispute between a physician and a hospital relating to alleged false claims made by the hospital to induce the physician to enter into an employment contract such as the one at issue in this litigation. The gravamen of defendant's UDTP counterclaim is that plaintiff made certain false representations to him prior to his entering into the

contract at issue and that those false representations constituted a violation of N.C. Gen. Stat. § 75.

Although no case has addressed a situation exactly like this one, other cases have interpreted the learned profession exception in some medical contexts. In *Wheeless*, the plaintiff physician brought a claim against the hospital based upon the hospital's complaint to the Medical Board about care provided by the plaintiff physician, but this Court held making a complaint to the Medical Board is integral to the hospital's role in providing medical care and thus falls within the exception:

> It is well-settled by our Courts that a matter affecting the professional services rendered by members of a learned profession therefore falls within the exception in N.C.G.S. § 75-1.1(b). Indeed, our Court has made clear that unfair and deceptive acts committed by medical professionals are not included within the prohibition of N.C.G.S. § 75-1.1(a). This exception for medical professionals has been broadly interpreted by this Court, and includes hospitals under the definition of "medical professionals." In this case, defendants' alleged conduct in making a complaint to the Medical Board is integral to their role in ensuring the provision of adequate medical care. Accordingly, plaintiff's argument is without merit.

*Wheeless*, 237 N.C. App. at 590-91, 768 S.E.2d at 123-24 (citations, quotation marks, ellipses, and brackets omitted).

Another case which provides guidance into our determination of whether the defendant's claim relates to the rendition of professional services is *Cameron v. New Hanover Memorial Hospital*, 58 N.C. App. 414, 293 S.E.2d 901 (1982). This case was

decided under a prior version of N.C. Gen. Stat. § 75-1.1, and this Court held that plaintiffs could not maintain a UDTP claim against the defendant. S*ee generally Cameron*, 58 N.C. App. at 445-46, 293 S.E.2d at 920-21. The holding was based upon the wording of N.C. Gen. Stat. § 75-1.1 at that time, which referred to a "seller." *See* N.C. Gen. Stat. § 75-1.1 (1975 Replacement). But since Chapter 75 had been amended just before *Cameron*, this Court noted, *in dicta*, that the result would have been the same under the amended version of the statute, which is the version in effect now. *Cameron*, 58 N.C. App. at 446, 293 S.E.2d at 920.

In *Cameron*, the plaintiffs were podiatrists who brought twelve different claims against the defendant hospital arising out of the hospital's denial of hospital staff privileges. *Id*. at 416, 293 S.E.2d at 904. The claims included allegations based upon the hospital's bylaws and application process, civil conspiracy, interference with contractual rights, "unfair methods of competition and unfair practices" in violation of G.S. 75-1.1, slander, and libel. *Id*. The Court noted that under the newly amended UDTP Act, the podiatrists' UDTP claims against the hospital would be barred by the learned profession exemption:

> We are constrained to add that our conclusion would not be different had we retroactively applied the current version of G.S. 75-1.1(a) & (b) in this case. Plaintiffs contend that the so-called "learned profession" exception in the current G.S. 75-1.1(b) does not exclude defendants' alleged "anticompetitive" conduct because that conduct involves "commercial" activity, not the rendering of "professional services." We do not agree for the following reasons.

At most, plaintiffs' evidence tends to show that Dineen and Thomas have individual, like personal opinions regarding the provision of hospital staff privileges to plaintiffs. Dineen's testimony indicates that his objection to plaintiffs is grounded in their qualifications to practice podiatry in a hospital. Further, upon plaintiffs' final request for an amendment to the New Hanover medical staff bylaws to include hospital staff privileges for podiatrists, the 13 November 1978 minutes of the Executive Committee state that the Credentials Committee recommended that staff privileges for podiatrists "be granted depending upon individual qualifications." Williams' testimony also shows that the New Hanover Board of Trustees considered qualifications as a paramount issue: "As to who has to make the choice, the Board has to determine with what information comes to it, all the information it can determine, whether they feel that those asking privileges have the qualifications that the hospital has set as standard."

This evidence indicates that defendants were acting in large measure pursuant to an "important quality control component" in the administration of the hospital. As one court described it, the hospital's obligation is to exact professional competence and the ethical spirit of Hippocrates as conditions precedent to staff privileges. We conclude that the nature of this consideration of whom to grant hospital staff privileges is a necessary assurance of good health care; certainly, this is the rendering of "professional services" which is now excluded from the aegis of G.S. 75-1.1.13. In this respect, the current version of G.S. 75-1.1 is not a substantive change from our prior law. Defendants' motions for a directed verdict upon this issue also were properly granted.

*Id.* at 446-47, 293 S.E.2d at 920–21 (citations, quotation marks, brackets and footnote

omitted).

*Cameron* dealt with staff privileges at the hospital, and, similar to *Wheeless*, this Court held the case fell within the learned profession exception because the hospital's process of evaluating the professional qualifications of physicians to determine whether a physician should have staff privileges at the hospital was necessary to assure "good health care" at the hospital. *Id.*

These cases addressing UDTP claims in a medical context do not suggest that negotiations regarding a business arrangement, even between a physician and a hospital, are "*professional services rendered* by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(a) (emphasis added). In *Wheeless*, the Court found that certain medical professionals making a complaint to the North Carolina Medical Board alleging that Dr. Wheeless had engaged in inappropriate and disruptive behavior fell within the learned profession exception because complaining to the medical board was "integral to their role in ensuring the provision of adequate medical care." 237 N.C. App. at 591, 768 S.E.2d at 124. In *Cameron*, the issue related to whether the plaintiff podiatrists should be granted staff privileges. The Court found that because the "consideration of whom to grant staff privileges is a necessary assurance of good health care[,] certainly, this is the rendering of 'professional services' which is . . . excluded from the aegis of [N.C. Gen. Stat. §] 75-1.1." 58 N.C. App. at 447, 293 S.E.2d at 921.

This case involves a business deal, not rendition of professional medical services. Defendant alleged that the hospital made false representations to induce him to enter into a contract; the fact that he is a physician does not change the nature of the negotiation of a business contract. Plaintiff declined to enter into an employment contract with defendant; if defendant had been an employee of plaintiff, this situation may be somewhat more similar to *Wheeless* and *Cameron*, but plaintiff wanted defendant to be an independent contractor with an independent practice. If we were to interpret the learned profession exception as broadly as plaintiffs suggest we should, any business arrangement between medical professionals would be exempted from UDTP claims. The learned profession exception does not cover claims simply because the participants in the contract are medical professionals. For example, if a physician entered into a lease agreement for space in a medical office building owned by a group of physicians or hospital and then seeks to bring a UDTP claim based upon a dispute over the lease, it should be treated no differently than a similar lease arrangement for parties in any other business. The fact that medical services will be provided in the building does not mean that the lease arrangement arises from rendition of professional services and has no effect on the quality of the medical care provided.

Taking the evidence in the light most favorable to defendant, as we must in reviewing a directed verdict, the trial court should have submitted defendant's UDTP

claim to the jury. The trial court therefore erred by granting directed verdict as to defendant's UDTP counterclaim.

## IV. Parol Evidence

Defendant argues that "the jury's verdict as to [defendant's] alleged breach of contract was unsupported by the plain terms of the agreement and the uncontroverted evidence. The jury was only able to reach its verdict by the impermissible use of parole [sic] evidence." (Original in all caps).

Defendant argues that the trial court should have granted his Rule 59 motion because of the improper parol evidence.

> The standard of review for denial of a Rule 59 motion is well-settled: According to Rule 59, a new trial *may* be granted for the reasons enumerated in the Rule. By using the word *may*, Rule 59 expressly grants the trial court the discretion to determine whether a new trial should be granted. Generally, therefore, the trial court's decision on a motion for a new trial under Rule 59 will not be disturbed on appeal, absent abuse of discretion. This Court recognizes a narrow exception to the general rule, applying a *de novo* standard of review to a motion for a new trial pursuant to Rule 59(a)(8), which is an error in law occurring at the trial and objected to by the party making the motion.

*Kor Xiong v. Marks*, 193 N.C. App. 644, 654, 668 S.E.2d 594, 601 (2008) (citation, quotation marks, and brackets omitted).

In this case, defendant contends that the typical abuse of discretion standard applies, and defendant's argument presents two discrete issues. Defendant argues

that without the admission of improper parol evidence regarding the parties' contract negotiations, the evidence would have been insufficient to support the verdict. The first issue is whether the trial court abused its discretion in admitting the alleged improper parol evidence. *See generally id*. If so, the second issue is whether the remaining evidence could support the verdict. If the trial court did not abuse its discretion in admission of the alleged parol evidence, then we need not consider the remainder of this argument, since there would be sufficient evidence to support the jury verdict. *See generally Nguyen v. Burgerbusters, Inc.*, 182 N.C. App. 447, 454, 642 S.E.2d 502, 508 (2007) ("[A] review of the record evidence before this Court shows that while defendant presented evidence in support of its position, plaintiff's evidence was sufficient to support the jury verdict. The jury verdict is not contrary to the greater weight of the evidence nor contrary to law, and defendant has not shown that the trial court abused its discretion in denying defendant's motion for new trial." (Citation omitted)).

Since the first portion of this argument deals with the admission of evidence, we must first consider whether the defendant preserved his objection to the particular evidence. As to preservation, defendant argues that

> After the jury returned its verdict, [defendant] filed a motion for a new trial based on the following argument: "The jury was improperly allowed to consider matters and things which were barred by the parole [sic] evidence rule, and as a result the verdict was based on improper evidence, and must be set aside." [Defendant] had already

- 21 -

> established his concern about the improper use of parole
> [sic] evidence as the jury considered the breach of contract
> claims, lodging a standing objection to [plaintiff's] parole
> [sic] evidence exhibits and questions. Counsel for
> [defendant] referenced these objections in its argument on
> the Rule 59 motion.

Our first difficulty with defendant's argument is that we are unable to identify

exactly what evidence he contends was improperly admitted. At the beginning of the

trial, before presentation of any evidence, defendant did "establish[ ] his concern"

about potential parol evidence issues and counsel for both parties discussed this

concern with the trial court.[4] Defendant noted that he would object to some of the

evidence of emails and other negotiations plaintiff may seek to present as improper

parol evidence. But since defendant brought counterclaims other than breach of

contract, such as the fraud and UDTP claims, defendant also planned to introduce

some of the emails and communications prior to the Physician Recruitment

Agreement. Defendant contended plaintiff committed fraud in the inducement to get

defendant to enter into the Physician Recruitment Agreement, not fraud after the

signing of the agreement. Defendant would seek to show that plaintiff fraudulently

induced him to enter into the contract and planned to use some of the communications

in support of this theory. Plaintiff contended that if defendant wanted to introduce

some of the communications leading up to the entry of the Physician Recruitment

---

[4] Defendant did not file a motion *in limine* seeking to exclude any evidence.

Agreement, all must be admitted so that the jury could understand the context of the discussion: "[I]f he sends an e-mail but not the reply - I think it all comes in, or none of it comes in." The issue was not resolved at the time, and the trial court noted that it would need to address the evidence as it was presented.

Defendant's brief directs us to only two places in the transcript of nine days of trial where he noted his objections to evidence he contends was improper parol evidence. The first objection came in response to plaintiff's introduction of an email identified as "Plaintiff's Exhibit 12," which was a response from the plaintiff to an email from defendant. The objection was: "Your Honor, just with our objection about the parol evidence." Defendant's second, and final, objection was just after the testimony about Exhibit 12:

> MR. BUCKNER: If Your Honor please. I guess if that was a question, we would object. And ask if we might have a renewed continuing objection to all of the communications before the merged agreement under the parol evidence rule, and also relevance.
>
> THE COURT: Your objection is noted. The objection is overruled. Thank you.
>
> MR. BUCKNER: Then a continuing objection?
>
> THE COURT: Your exception is noted. Yes, sir.
>
> MR. BUCKNER: I don't want to keep interrupting, but --
>
> THE COURT: The Court will note a continuing objection by the defense to questions related to this series of e-mails.

As a general rule, a party must make a contemporaneous objection to evidence to preserve the issue for appellate review. *See State v. Gray*, 137 N.C. App. 345, 348, 528 S.E.2d 46, 48 (2000) ("Based on the established law of this State, because defendant failed to object to the admission of the evidence at the time it was offered, he has failed to preserve this issue for our review."). But even if we were to assume that defendant's "continuing objection" here was a valid objection, defendant's brief has not noted which particular exhibits or testimony he contends would have been covered by this "continuing objection." This trial lasted nine days, and there was extensive testimony and evidence of the emails and other communications between the parties leading up to the entry of the Physician Recruitment Agreement, and certainly some of this evidence defendant used to further his counterclaims of fraud in the inducement and UDTP. We are simply unable to sort out which bits of testimony and which exhibits might fall under defendant's continuing objection to improper parol evidence and which bits are evidence defendant sought to use for his own purposes of showing fraud in the inducement. And since defendant's brief did not clearly identify which evidence it claims was erroneously admitted, plaintiff also did not have the opportunity to respond as to any specific exhibit or testimony but could only argue in broad terms the various reasons the communications prior to the Physician Recruitment Agreement would be admissible. Defendant did not make contemporaneous objections to the alleged parol evidence and did not sufficiently

identify the evidence he claims was admitted in error, so he has not preserved this argument for appeal. *See, e.g., id.* Since defendant's argument regarding his Rule 59 motion and sufficiency of the evidence is based upon the jury's consideration of parol evidence, which should not have been admitted, and we have determined that all of the evidence was properly before the jury, we need not address the remainder of defendant's argument. This issue is without merit.

## V.    Conclusion

For the reasons stated above, we affirm in part and reverse and remand the granting of directed verdict as to defendant's UDTP counterclaim.

AFFIRM IN PART; REVERSE AND REMAND IN PART.

Judge ARROWOOD concurs.

Judge DAVIS dissents in part with separate opinion.

DAVIS, Judge, dissenting in part.

While I concur in the majority's well-reasoned opinion on the remaining issues in this case, I respectfully dissent from Section III of its opinion as I believe the trial court properly granted a directed verdict as to Defendant's counterclaim for unfair and deceptive trade practices under Chapter 75 of the North Carolina General Statutes ("UDTP Claim").

The trial court granted the motion for a directed verdict based upon the "learned profession" exception to UDTP claims. N.C. Gen. Stat. § 75-1.1 states, in pertinent part, as follows:

> (a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.
>
> (b) For purposes of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a *learned profession*.

N.C. Gen. Stat. § 75-1.1(a), (b) (2017) (emphasis added).

In *Reid v. Ayers*, 138 N.C. App. 261, 531 S.E.2d 231 (2000), this Court articulated the following test to determine when the learned profession exception applies: "In order for the learned profession exemption to apply, a two-part test must be satisfied. First, the person or entity performing the alleged act must be a member of a learned profession. Second, the conduct in question must be a rendering of professional services." *Id.* at 266, 531 S.E.2d at 235 (citations omitted).

There is no dispute that doctors and hospitals are members of a learned profession. *See Wheeless v. Maria Parham Med. Ctr., Inc.*, 237 N.C. App. 584, 590, 768 S.E.2d 119, 123-24 (2014), *disc. review denied*, 368 N.C. 247, 771 S.E.2d 284 (2015); *see also Burgess v. Busby*, 142 N.C. App. 393, 407, 544 S.E.2d 4, 11-12, *reh'g denied*, 355 N.C. 224, 559 S.E.2d 554 (2001); *Gaunt v. Pittaway*, 139 N.C. App. 778, 784, 534 S.E.2d 660, 664 (2000), *cert. denied*, 353 N.C. 371, 547 S.E.2d 810 (2001), *cert. denied*, 534 U.S. 950, 151 L. Ed. 2d 261 (2001); *Abram v. Charter Med. Corp. of Raleigh*, 100 N.C. App. 718, 722, 398 S.E.2d 331, 334 (1990), *disc. review denied,* 328 N.C. 328, 402 S.E.2d 828 (1991). Here, the first prong of the test is clearly satisfied as both Plaintiff and Defendant are members of a learned profession.

With regard to the second prong, none of the cases cited by the parties concern a dispute arising from a contractual arrangement between members of a learned profession similar to the one at issue in the present case. This Court has made clear, however, that the learned profession exception is to be construed broadly.

> It is well-settled by our Courts that a matter affecting the professional services rendered by members of a learned profession therefore falls within the exception in N.C.G.S. § 75-1.1(b). Indeed, our Court has made clear that unfair and deceptive acts committed by medical professionals are not included within the prohibition of N.C.G.S. § 75-1.1(a). This exception for medical professionals has been broadly interpreted by this Court, and includes hospitals under the definition of "medical professionals." In this case, defendants' alleged conduct in making a complaint to the Medical Board is integral to their role in ensuring the provision of adequate medical care. Accordingly, plaintiff's

2

argument is without merit.

*Wheeless*, 237 N.C. App. at 590-91, 768 S.E.2d at 123-24 (citations, quotation marks, ellipses, and brackets omitted).

Another case that provides guidance on this issue is *Cameron v. New Hanover Mem'l Hosp.*, 58 N.C. App. 414, 293 S.E.2d 901 (1982), *disc. review denied*, 307 N.C. 127, 297 S.E.2d 399 (1982). *Cameron* was decided under a prior version of N.C. Gen. Stat. § 75-1.1, and this Court held that the plaintiffs could not maintain a UDTP claim against the defendant. *Id.* at 446, 293 S.E.2d at 920. We noted, albeit in *dicta*, that the result would have been the same under the amended version of the statute (which is the version currently in effect). *Id.*

In *Cameron*, the plaintiffs were podiatrists who brought a number of claims against the defendant hospital arising out of the hospital's denial of the plaintiffs' request for staff privileges, including a UDTP claim. *Id.* at 446, 293 S.E.2d at 920. This Court noted that even under the newly amended UDTP Act, the podiatrists' UDTP claim against the hospital would be barred by the learned profession exception.

> We are constrained to add that our conclusion would not be different had we retroactively applied the current version of G.S. 75-1.1(a) & (b) in this case. Plaintiffs contend that the so-called "learned profession" exception in the current G.S. 75-1.1(b) does not exclude defendants' alleged "anticompetitive" conduct because that conduct involves "commercial" activity, not the rendering of "professional services." We do not agree for the following reasons.
>
> At most, plaintiffs' evidence tends to show that Dineen and

3

Thomas have individual, like personal opinions regarding the provision of hospital staff privileges to plaintiffs. Dineen's testimony indicates that his objection to plaintiffs is grounded in their qualifications to practice podiatry in a hospital. Further, upon plaintiffs' final request for an amendment to the New Hanover medical staff bylaws to include hospital staff privileges for podiatrists, the 13 November 1978 minutes of the Executive Committee state that the Credentials Committee recommended that staff privileges for podiatrists "be granted depending upon individual qualifications." Williams' testimony also shows that the New Hanover Board of Trustees considered qualifications as a paramount issue: "As to who has to make the choice, the Board has to determine with what information comes to it, all the information it can determine, whether they feel that those asking privileges have the qualifications that the hospital has set as standard."

This evidence indicates that defendants were acting in large measure pursuant to an "important quality control component" in the administration of the hospital. As one court described it, the hospital's obligation is to exact professional competence and the ethical spirit of Hippocrates as conditions precedent to staff privileges. We conclude that the nature of this consideration of whom to grant hospital staff privileges is a necessary assurance of good health care; certainly, this is the rendering of "professional services" which is now excluded from the aegis of G.S. 75-1.1. In this respect, the current version of G.S. 75-1.1 is not a substantive change from our prior law. Defendants' motions for a directed verdict upon this issue also were properly granted.

*Cameron*, 58 N.C. App. at 446-47, 293 S.E.2d at 920-21 (citations, quotation marks, brackets and footnote omitted).

4

*Cameron* is analogous to the present case as it involved a dispute between medical professionals and a hospital — both members of a learned profession — and the plaintiffs' claims were based upon their attempt to provide medical care as podiatrists at the defendant hospital. Although the claims did not involve breach of contract or a proposed employment arrangement, the effect is essentially the same: the hospital was making arrangements for medical professionals to provide care to patients served at its facilities.

Here, Plaintiff and Defendant were seeking to do the same thing. Plaintiff was making arrangements, or attempting to make arrangements, for Defendant to provide medical care to patients served at its facilities. In this sense, the negotiations and contractual arrangement between Plaintiff and Defendant were "integral to their role in ensuring the provision of adequate medical care." *Wheeless*, 237 N.C. App. at 591, 768 S.E.2d at 124. The agreement even included specific requirements for Defendant to be on emergency call at the Hospital and to accept unassigned patients. Thus, these provisions of the agreement address the rendition of professional services by both the Plaintiff and Defendant and fall within the learned profession exception.

For these reasons, I believe the trial court did not err by granting a directed verdict dismissing Defendant's UDTP claim against Plaintiff. Accordingly, I respectfully dissent.